IN ERROR.
••••••
ALBANY,
April, 1816.
~~~~~~
FIREM. INS. Co.
v.
LAWRENCE.

THE NEW-YORK FIREMEN INSU- } *Plaintiffs in Error.*
RANCE COMPANY                }

*against*

JONATHAN LAWRENCE, Jun. survivor } *Defendant in Error.*
of HENRY WHITNEY, deceased.       }

*Goods were in-*
*sured at and from*
*New-York to Got-*
*henburg, and at*
*and from thence*
*to one port in the*
*Baltic or North*
*Sea, not south of*
*the river Jade.*
*The ship having*
*sailed from New-*
*York arrived at*
*Gothenburg on*
*the 17th of July,*
*1810, where she*
*remained until*
*the 8th of Octo-*
*ber, being de-*
*tained by ad-*
*verse winds.*
*The master, ac-*
*cording to in-*
*structions from*
*the supercargo,*
*sailed from Got-*
*henburg to St.*
*Petersburg, to*
*which place the*
*vessel was pro-*
*ceeding; but*
*meeting with*
*accidents was*
*compelled from*
*necessity to put*
*into Carlsham*
*for repairs, on*
*the 1st of No-*
*vember, and sail-*
*ed from thence*
*again, on the 10th*
*of November, for*
*St. Petersburg ;*
*but on the 11th*
*was compelled*
*by stress of wea-*
*ther again to put*
*back to Carls-*
*ham, and was*
*detained by ad-*
*verse winds un-*
*til the season be-*
*came too late to*
*navigate the*
*gulf of Finland :*
*during this de-*
*tention the su-*
*percargo deter*
*mined to send*
*the vessel to*
*Stockholm, for*
*which place she*
*was cleared, and*
*on the 2d of*

THIS was an action on a policy of insurance, by which the defendant in error, and his former co-partner, *Henry Whitney,* deceased, were insured in the sum of 20,000 dollars, at a pre-mium of 10 per cent., to return 11 per cent. if the risk ended at *Gothenburg,* without loss, upon goods on board the ship *Atlantic,* *Charles Jayne,* master, for a voyage *at and from New-York to Gothenburg, and at and from thence to one port in the Baltic or North Sea, not south of the river Jade, with liberty of discharging the cargo, in whole or in part, at either port she might go to.* A special verdict was found by the jury in the court below, where-on judgment was rendered for the defendant in error, in *August* term, 1814; to reverse which judgment a writ of error was brought.

The special verdict stated, that the vessel sailed from *New-York,* and arrived at *Gothenburg* on the 17th of *July,* 1810 : that after her arrival at *Gothenburg,* the defendant in error, and his de-ceased partner, by their agent duly authorized, on the 28th of *July,* determined to proceed with the ship to *St. Petersburg,* a port in the *Baltic,* not south of the river *Jade,* and gave instructions to the master accordingly : that on the 8th of *October,* and as soon as the wind and weather would permit, the ship departed from *Gothenburg* to *St. Petersburg,* and while on her due course to the latter place, was, on the 1st of *November,* by stress of wea-ther, and to repair the damage occasioned by the dangers and perils of the sea, obliged to put into the port of *Carlsham,* where she remained until the damages were repaired ; and as soon as the wind and weather would permit, on the 10th of *November,* again sailed for *St. Petersburg,* and on the 11th of *November,* she was obliged, by adverse winds, and stress of weather, to re-

*May,* sailed on her destination to *Stockholm,* and before she came to the dividing point of the routes to *Stockholm* and *St. Petersburg,* was captured by a *French* privateer, carried into *Dantzic,* and afterwards condemned by the council of prizes at *Paris.* Held, that there was an intention to deviate only, and that the vessel being lost before she arrived at the dividing point, the insurers were liable.

IN ERROR.

••••••

ALBANY,
April, 1816.

FIREM INS. CO.
v.
LAWRENCE.

turn to *Carlsham,* where she arrived on the same day : that she was detained by adverse winds until the 1st of *December,* when the season became too far advanced to navigate the gulf of *Finland,* and pursue her voyage to *St. Petersburg* until the navigation of the *Baltic* should again open : that during the detention of the vessel at *Carlsham,* the defendant in error, and his deceased partner, by their supercargo and agent, determined to proceed to *Stockholm* in *Sweden,* and not to *St. Petersburg,* and the master was instructed accordingly : that on the 1st of *May* a clearance was taken at *Carlsham* for *Stockholm,* being a port in the *Baltic* not south of the river *Jade :* that afterwards, as soon as the opening of the navigation in the *Baltic* would permit, on the second of *May,* the vessel sailed towards *Stockholm,* with a destination for *Stockholm,* and not *St. Petersburg,* and the supercargo remained at *Carlsham :* that while proceeding for *Stockholm,* she was, on the 3d of *May,* captured by a *French* privateer, called the *Petit Diable :* that when the *Atlantic* was captured she was in the direct route, either to *Stockholm* or *St. Petersburg,* and whether she had been going to the one or the other of those places, her course after she left *Carlsham,* and her course also after she left *Gothenburg,* and until she was captured, would have been the same ; the course from *Carlsham,* and also the course from *Gothenburg* to *St. Petersburg,* and from *Carlsham,* as also from *Gothenburg* to *Stockholm,* being the same to a point at which the *Atlantic* had not arrived when she was captured : that she was carried by the privateer to *Dantzic,* her papers sent to *Paris,* and, with the cargo, was condemned by the council of prizes at *Paris* on the 10th *September,* 1811 ; and the following was the decree of condemnation : " The council decides the prize made by the *French* privateer, the *Petit Diable,* of the ship *Atlantic,* under the *American* flag, carried into *Dantzic,* good and valid ; consequently, adjudges to the owners and crew of the said privateer, all the said vessel, as well as the merchandize of her cargo, the whole to be sold at vendue, according to the forms, and in the manner prescribed by the laws and regulations made concerning prizes." That due preliminary proof was properly exhibited, and that, in consequence of the capture and condemnation of the ship, and of the goods, wares, and merchandize, the same goods, wares, and merchandizes became, and were, totally lost to the assured.

An action was, also, brought by the defendant in error, against

*IN ERROR*
......
ALBANY,
April, 1816.

FIREM. INS. CO.
v.
LAWRENCE.

the *Ocean Insurance Company*, on a policy on goods in the same vessel which involved the questions arising in the present cause, and which was argued in the court below, and judgment given for the defendant in error, and judgment was, also, given in the present cause, for the defendant in error; as standing upon the same ground with the other cause, and being governed by that decision. (See *Lawrence* v. *The Ocean Insurance Company*, 11 *Johns. Rep.* 241.)

The Chief Justice stated the reasons of the judgment of the supreme court. (See 11 *Johns Rep.* 259. 263.)

*S. Jones,* jun. for the plaintiffs in error. It is evident from the face of the policy, that the right of electing the port to which the vessel should ultimately proceed, was left with the assured; and it is also evident, that the assured was bound to make his election at *Gothenburg.* He had no right to proceed from *Gothenburg* to a port of inquiry, but was bound to sail to a port of discharge. At *Gothenburg* the election was made to proceed to *St. Petersburg,* and the subsequent abandonment of that voyage at *Carlsham,* and the substitution of another, discharged the insurers. If a person once determines his election, it shall be determined for ever;[*] certainty in the description of the voyage is requisite in a contract of insurance.[†] In this case, the port to which the vessel should proceed on leaving *Gothenburg* was to be ascertained at that place; *id certum est quod certum reddi potest;* and on being reduced to certainty by the election of the assured at *Gothenburg,* he had no power to depart from it, and adopt another destination. If not bound by his election at *Gothenburg,* neither was he bound by his decision at *Carlsham,* but had an unlimited power of recalling his last determination, and of shifting, according to whim and caprice, the ultimate port of destination. How little would such a permission be consistent with the precision required by the nature of the contract! The change of voyage made at *Carlsham* was not a mere intended deviation, but it was an abandonment of the voyage insured.

There are three classes of cases in relation to this subject; 1. Where there has never been an inception of the voyage; 2. Where there has been a deviation, by unnecessarily touching at an intermediate port; and, 3. Where there is an entire change and abandonment of the voyage. In the present case;

[*] *Com. Dig. Elec.* (e. 2.) *Cases cited in* 11 *Johns Rep.* 254.
[†] *Marsh. on Ins.* 321.

it is urged, that there was merely an intended deviation; but there can be no deviation unless the original object of the voyage remains, and to which it is intended afterwards to recur: unless the *termini* continue, there can be nothing from which to deviate; here, one of the *termini* was relinquished, and hence it is contended that the voyage was abandoned. In the various cases in respect of deviation,* the *termini* were unaltered; there was a digression from the original destination which was still preserved. *Wooldridge* v. *Boydell*,† is extremely like this case. The insurance was from *Maryland* to *Cadiz*, but the clearance was for *Falmouth*, and although it was uncertain whether that was actually the destination, yet it was certain that it was not *Cadiz*: as, in this case, *St. Petersburg* was made the *terminus ad quem*, by the election of the assured, which he could not afterwards vary; and in that case, as in this, the vessel was captured before she arrived at the dividing point, the insurer was held to be discharged; and Lord *Mansfield* observes, that in all the cases of intended deviation, the *terminus a quo*, and *ad quem*, were certain and the same; and *Buller*, J. says, there cannot be a deviation from what never existed. In *Stocker* v. *Harris*,‡ cited by *Van Ness*, J. in the court below,§ the insurance was from *Boston* to the *Canaries*, at and from thence to any port or ports of *South America*, and at and from thence to her port of discharge in the *United States*. The vessel went to the *Canaries*, and, under *Spanish* colours and papers, from thence to *Vera Cruz*, and then proceeded to the *Havanna*, where she was to exchange her papers, and thence return to the *United States*. On her course to the *Havanna*, but before she had left the track she must have taken if coming to the *United States*, the ship was captured; and it was held, that the insured was not entitled to recover. Now, although, *Sewall*, J., in delivering the opinion of the court, speaks of the voyage to the *Havanna* as a deviation, yet it is evident that the term was not used in its strict acceptation, (and, indeed, he calls it a distinct and additional risk,) and that the real ground of decision was the substitution of a new voyage, which, under the particular circumstances of that case, did not come within the permission to visit *any ports* of *Spanish America*. Had it been deemed a deviation, in the appropriate sense of the phrase, it is evident that the decision would have been otherwise, because, at the time of the capture, it was but *intended*.

IN ERROR.

ALBANY,
April, 1816.

FIREM. INS. CO.
v.
LAWRENCE.

* *See Cases cited* 11 *Johns. Rep* 253.

† *Doug.* 16.

‡ 3 *Mass. Rep.* 409.

§ 11 *Johns. Rep,* 269.

IN ERROR.
........
ALBANY,
April, 1816

FIREM. INS. CO.
v.
LAWRENCE.
* 1 Campb. 454.

*Blackenhagen* v. *The London Assurance Company*,* is also a case of abandonment of voyage, placed expressly on that ground, and that too, after the inception of it. The insurance was from *London* to *Revel*. On the voyage it was learned that an embargo had been laid there; in consequence, the vessel put back to *Copenhagen* roads, and afterwards lay off *Gothenburg* six days, and might have entered that friendly port, if the master had thought fit, and while proceeding on her way back to *England* was lost: as the return to *England* was not with a view of finally getting to *Revel,* for which purpose the vessel ought to have put into *Gothenburg,* it was successively held by Lord *Ellenborough* and *Mansfield,* Ch. J., that the insured was not entitled to recover.† But it may, perhaps, be said, that the original design of going to *St. Petersburg* might be resumed after leaving *Carlsham,* and that the assured could have availed themselves of the *locus pœnitentiæ.* But how, and by whom, was this to be done ? Certainly not by the supercargo, for there was a *physical* disability on his part; he was left behind at *Carlsham:* nor by the master, for he was *morally* unable to do it; his instructions were express to go to *Stockholm ;* it was his duty to obey them, and the possibility of violating a duty is never to be presumed, still less is the probability of it to be made a ground of argument. Where the master has orders he is not at liberty to exercise his judgment.‡

*Henry,* and *T. A. Emmet,* contra. The port of destination by this policy was left floating, and the assured were at liberty to go to whatever port they might find open for them, and which they might choose to enter. They might at any time elect the ultimate point of destination, subject only to the restriction that the insurers were not to run double or increased risks. The assured were not bound to elect at *Gothenburg,* any more than if *Gothenburg* had not been named in the policy. Suppose the voyage had been direct from *New-York* to a port in the *Baltic,* when would they have been bound to decide ? Certainly not until a choice became absolutely necessary : and the same rule must apply to the voyage from *Gothenburg* as would have applied to one from *New-York.* The election at *Gothenburg* was not binding upon the assured, but they were at liberty to elect after sailing from *Carlsham,* for it did not create a double risk : the object of the policy was to leave the ultimate port always open for selection; it was peculiarly fit that it should be so on account of

† But from a note of the reporter, it appears that a new trial was afterwards granted by the court of C. P.

‡ 7 *Term Rep.* 160.

IN ERROR.
......
ALBANY,
April, 1816
FIREM. INS. Co.
v.
LAWRENCE.

the unsettled and continually shifting state of that part of *Europe* to which the vessel was bound. It was not final, because the insured were under no obligation to make it. There was no such stipulation in the policy : had it been intended that an election should have been made, it would have been provided for by the contract; and then the insured, on making the election, would have been bound to make it known. Such stipulation was not necessary for the protection of the insurers ; for after the vessel had passed the dividing point, she could not have retraced her course. We must look to the contract as it was written, which shows that the undefined port was never intended to be filled up, but it was left open for the assured to go to any port within the range of the policy without previous election, only that the risk must not be varied or increased, and that the vessel must keep on directly in the *iter* to some port within that range. The change of destination from *Petersburg* to *Stockholm*, did not alter the identity of the voyage, or substitute a new contract, because they were both within the range of the policy ; the *termini* still continued the same.*

*\* Cases cited 11 Johns Rep. 261.*

But suppose that the determination to go to *St. Petersburg* concluded the assured, and that that was the *terminus* in the policy, still it was only an intended alteration or deviation. There are but two classes of cases on this subject: 1. Where the voyage has never been commenced; and, 2. Where there is a deviation. This second class includes the two last classes made by the counsel on the other side ; and the difference between the two sets, into which the cases are distinguishable, is, that in the first there is a return of premium, but not in the second. A substitution or change of voyage, and a deviation, are precisely the same thing. After the voyage has been once commenced there can be no substitution of a new voyage, in the sense contended for by the opposite party, for it must be of one entire voyage for another, and that is impossible, where one of the *termini* continues fixed. The language of Lord *Mansfield*, in *Lavabre* v. *Wilson*,† shows that he considered the terms as equipollent. " The true objection to a deviation," he says, " is not the increase of the risk. If that were so, it would only be necessary to give an additional premium. It is that the party contracting has voluntarily *substituted* another voyage for that which has been insured." Such is evidently the understanding of the writers on insurance;‡ and according to *Millar*,§ a deviation is a variation from the policy adopted after the risk has

*† Doug. 291.*

*‡ Marsh. Ins. 183. 185, 186 Park Ins. 387.
§ On Ins. 389.*

IN ERROR.
.......
ALBANY,
April, 1816.

FIREM INS. Co.
v.
LAWRENCE.

* De Assecura-
tionibus, n. 20.

† Note 52.

‡ Note 93.

§ Doug. 361.

‖ Doug. 16.

** See cases as
to deviation. 11
Johns. Rep. 253.
†† 3 Mass. Rep.
409.

commenced. *Roccus** treats of deviation and change of voy-
age as the same thing, and considers both as arising subse-
quently to the commencement of the risk. *Si navis mutaverit
iter, vel ceperit secundum viagium, vel convenerit asportare alias
merces in alium locum, vel alias assecurationes fecerit pro dicto
secundo viagio, tunc in casibus prædictis assecuratores pro primo
viagio, amplius non tenentur : nam cum navis divei terit ad ex-
traneos actus, dicitur mutasse iter, et plura viagia fecisse, et
primum dicitur mutatum : limita tamen si mutetur iter ex justa
causa.* And again :† *Periculum intelligitur solum currere as-
securator pro illo itinere convento, et non pro alio ; nam si navis
mutaverit iter, vel a via recta illius itineris diverterit, non tenetur
amplius assecurator : nunc vero limita si iter mutaverit ex aliqua
justa et necessaria causa, &c.* He also states an adjudged case,‡
in which the defence was, that the ship *mutavit iter,* and the in-
sured recovered, because, *ex legitima et necessaria causa iter ipse
diverterit.*

*Thellusson* v. *Ferguson,*§ was an insurance on a ship from
*Guadaloupe* to *Havre;* and it was questionable whether *Brest*
was not the real destination; the vessel was captured before
arriving at the dividing point. One of the points was, that the
ship never sailed on the voyage insured, viz. from *Guadaloupe*
to *Havre,* but on a voyage from *Guadaloupe* to *Brest :* but Lord
*Mansfield* says, " the voyage to *Brest* was, at most, but an in-
tended deviation, not carried into effect :" and it appears that
the vessel certainly sailed from her first port in *Guadaloupe* for
*Havre,* and that the intention was afterwards formed. This
case is decisive to show that a subsequent abandonment of the
*terminus ad quem* is only a deviation. In *Woolridge* v. *Boy-
dell,*‖ cited on the other side, the vessel never did sail on the
voyage insured, so that it was a case of non-inception, and not
of deviation. Whether it be intended to relinquish the port of
destination, or merely to go out of the course of the voyage,
and then return to it, if the intention be not carried into effect,
but the loss arises before arriving at the dividing point, the
insurer is held liable. The *terminus ad quem* is never inquired
into, or kept in view on the subject of deviation, except where
there is no inception of the voyage, or a justifiable deviation.
In these two cases the *terminus ad quem* is material, and is
never lost sight of in the discussion, but in no other.** In
*Stocker* v. *Harris,*†† relied on by the opposite counsel, the in-

tention to go to the *Havanna* was formed before leaving *Vera Cruz*, so that the return voyage was never commenced; although there are cases in which an intention to touch at a port out of the *iter*, for purposes of " a distinct trade and business,"[*] has been held an intention to deviate only; such were the cases of *Foster* v. *Wilmer*, and *Carter* v. *The Royal Exchange Assurance Company*;[†] and those cases, as well as *Kewley* v. *Ryan*,[‡] *Silva* v. *Low*,[§] *Henshaw* v. *The Marine Ins. Company*,[||] and *The Marine Ins. Company of Alexandria* v. *Tucker*,[**] show that the question of deviation is not affected by its being intended before the departure of the vessel on her voyage. *Forbes* v. *Church*,[††] was a case of non-inception, and a return of premium was directed. In *Driscoll* v. *Passmore*,[‡‡] and *Driscol* v. *Bovil*,[§§] there was an actual, but justifiable deviation; and, therefore, according to the distinction which has been urged, the *terminus ad quem* was a proper subject of discussion. What is said in *Norville* v. *Barbe*,[||||] that where the *terminus ad quem* is changed, it is not a deviation, but an abandonment of the voyage, is merely the *dictum* of counsel, and can have no weight. In *Blackenhagen* v. *The London Ass. Company*,[***] there was an actual deviation, an actual abandonment of the voyage. Going to *Stockholm* instead of *St. Petersburg* could not, in this case, materially affect the risk, and ought not to be allowed to discharge the underwriters. There was always room for a resort to the *locus pœnitentiæ*, for the intention was still unexecuted, and was not binding. A man is not permitted to avail himself of the *locus pœnitentiæ* to do an immoral act, but in every other case he may have recourse to it. Suppose the master's instructions were founded upon circumstances which he afterwards discovered to be false, might he not disregard his orders, and go to the port originally intended? The clearance to *Stockholm* was only evidence of intention; and although the supercargo remained at *Carlsham*, still he might have gone on board, or sent, and given other instructions : but as the intention, whether to deviate or to abandon the voyage, was never carried into execution, it cannot be regarded by the court.

*D. B. Ogden*, in reply, said, that the idea of a *floating* policy was altogether new; and insisted, that the assured were bound to elect at *Gothenburg*, which, when done, was decisive and irrevocable. It was the unanimous opinion of the supreme court, that the election was made at *Gothenburg*, and was bind-

IN ERROR.
......
ALBANY,
April, 1816.

FIREM. INS. CO.
v.
LAWRENCE.

[*] 3 *Mass. Rep.* 418.
[†] *Str.* 1249.
[‡] 1 *H Bl.* 343.
[§] 1 *Johns. Cas.* 184.
[||] 2 *Caines' Rep.* 274.
[**] 3 *Cranch*, 357.
[††] 3 *Johns. Cas.* 159.
[‡‡] 1 *Bos. & Pull.* 200.
[§§] 1 *Bos. & Pull.* 313.
[||||] 2 *New. Rep.* 434. *Marsh.* 836.
[***] 1 *Campb.* 454. *Park Ins.* 226.

IN ERROR.
........
ALBANY,
April, 1816.

FIREM. INS. CO.
v.
LAWRENCE.
* 1 Johns. Rep.
333.

† Doug. 16.

† 2 H. Bl. Rep.
343.

§ 3 Mass. Rep.
409.
‖ 1 Campb. 454.
** Doug. 361.

†† 7 Term Rep.
160.

ing. The present is not like those cases in which the insurance has been to a certain place and a market, as was *Maxwell* v. *Robinson & Hartshorne*,* in which the policy was on a voyage to *Barbadoes* and a market; and it was proved to be the usage of trade to allow the vessel to go from island to island, to dispose of her cargo; but the court declared that they did not mean to say, that the same construction was to be given to a policy in any other trade than that to the *West-Indies*. Here there was no proof of any usage of trade. The voyage was, then, at and from *New York* to *Gothenburg*, and at and from *Gothenburg* to *St. Petersburg*, and *Carlsham* was a port of necessity: but by making *Carlsham* a new starting point on a new voyage, it ceased to be a port of necessity; and then the true point in controversy arises, whether the vessel were lost on the voyage insured, or on a new voyage? The proof shows the latter to have been the fact. The case of *Wooldridge* v. *Boydell*,† is in point, and in that case, as in this, the jury found that the vessel did not sail on the voyage insured, and was on a distinct voyage when lost. In *Kewly* v. *Ryan*,‡ the court distinguish between that case and the one last cited, and put their decision expressly on the ground, that the *termini* of the intended voyage were really the same as those described in the policy, and that, therefore, it was to be considered as the same voyage. The counsel relied strongly on *Stocker* v. *Harris*,§ and cited *Blackenhagen* v. *The London Assurance Company*.‖ *Thellusson* v. *Fergusson*,** he said, was inapplicable, for there it was always the intention to go to *Havre*, and, at the most, to take *Brest* in the way. He denied that there can be no substitution of a voyage, where there is no return of premium; nor can it be contended that the master might have abandoned the voyage to *Stockholm* and gone to *St. Petersburg*. He was bound to pursue his instructions,†† and was out of the reach of the only person authorized to revoke them.

THE CHANCELLOR. Two questions arise upon this case:

1. Whether the determination of the assured while at *Gothenburg* to go to *Petersburg* was not binding, so as to render *Petersburg* the port of destination equally as if it had been originally inserted in the policy?

2. Whether the determination at *Carlsham* to abandon *Petersburg*, and go to *Stocholm*, and the sailing for *Stockholm* in pre-

IN ERROR.
........
ALBANY
April, 1816.

FIREM. INS CO.
v.
LAWRENCF.

ference of that determination, and under instructions to the master to that effect, was not an abandonment of the voyage insured so as to discharge the underwriter?

1. Liberty was given to the assured, to select, after the commencement of the voyage, the port of destination, and the only limit to his choice was, that the port was to be in the *Baltic* or *North Sea*, not south of the river *Jade*. The time when it was to be made was not specified; nor do I think it necessary for us now to decide whether the election of the port of destination might have been deferred until after the departure from *Gothenburg*, for the assured *did* make his election while at *Gothenburg*, and he had a right to make it *there ;* and being made, it puts an end to the inquiry. It is a fact found by the verdict, that the vessel being at *Gothenburg*, the assured, by their authorized agent, did determine to go to *Petersburg*, and did instruct the master accordingly, and the vessel sailed for *Petersburg* under that determination. This was an exercise of the right of election, and being fairly made and acted upon, it was binding and definitive upon the party. On this point the supreme court were unanimous, and on this point the argument and the law are equally decisive. Nor should I have thought it necessary to have dwelt a moment upon it, if it had not been insisted upon by one of the learned counsel for the defendants in error, that though the assured, while at *Gothenburg,* elected to go to *Petersburg*, and sailed for that port, and persevered in that election until the spring following, yet, that the assured was still at liberty to elect another port.

The principle of law is, that if a man has an election to do or demand one of two things, and he determines his election, it shall be determined for ever. This is so laid down by Lord Ch. B. *Comyns*, (*Dig.* tit. *Election*, c. 2.) who has always been deemed a great authority. There is a case given in *Rolle*, (1 *Rol. Abr.* 726. tit. *Election E.*) in support of this doctrine. A man delivers an obligation to A. for the use of B., and B., as soon as he hears of it, refuses the bond ; this refusal is peremptory, and he cannot afterwards accept of it. The modern case of *Layton* v. *Pearce*, in the K. B. (*Doug.* 14.) is another illustration of the rule. The defendant had received of G. 1*l.* 6*s.*, on condition, that if a certain lottery ticket should come up a blank or a prize on the next day, he would deliver to G. an undrawn ticket, or pay him 20*l.* Lord *Mansfield* said, in behalf of the court, that they were of opinion, that if the option had been in G., and if he

IN ERROR.

ALBANY,
April, 1816.

FIREM. INS. CO.
v.
LAWRENCE.

had made his election to take the 20*l.*, he would have *put an end to the alternative*, and have converted the agreement into an *absolute* contract for the payment of money.

The rule seems to be everywhere admitted. The numerous cases which treat of alternative obligations assume this as a conceded point, and I apprehend it to be most clearly and uniformly settled, that if a party has an election reserved to him in a contract, and he once fairly exercises that right of election, his determination is binding. This is the good sense and reason of the thing. If A. gives B. one of the horses in his stable, according to the instance given in *Coke*, B. has his election to take which he pleases, as no one in particular was designated by A.; but having elected one, all will agree that he cannot return it and take another. It is most convenient, in all manner of dealing, that contracts, uncertain at first, should be reduced to certainty as soon as possible, to guard against the temptations and speculations which that very uncertainty may lead to. We can see the injustice of the application of a contrary doctrine in this very case.

The determination to go to *Petersburg* is said not to be binding, and that the party was at liberty, at any time afterwards, to change it, subject to some equitable modifications which were suggested. But can we say, from the facts in this case, that the election to go to *Petersburg* did not determine the fate of the voyage? Are we certain the loss would have happened without the influence of that very determination? The captain, on the 1st of *December*, at *Carlsham*, gave up the voyage for the winter, because the season was too far advanced to navigate the gulf of *Finland*. Be it so; but was it too far advanced to navigate to *Stockholm*, which is not in the gulf of *Finland*, but is above half a degree of latitude south of *Petersburg*, and perhaps 300 miles of shorter navigation? For aught that appears in this case, or that we can know, the vessel might have gone conveniently and safely to *Stockholm* in *December*, and, therefore, have avoided the capture in the ensuing spring. We have a right to say it was the election previously made to go to *Petersburg*, and which still kept its hold on the mind of the party that prevented the other destination. The election made at *Gothenburg*, probably controlled and fixed the destinies of this voyage, and brought on the final catastrophe. Shall the party, then, be at liberty to say it was a matter of no conse-

quence, and that he was free to change his purpose when he pleased, and that the underwriter must remain liable to all the hazard of determinations partly executed and then abandoned? Such a construction appears to have as little foundation in justice as in law, and we ought to consider this case as if *Petersburg* had been the place of destination inserted in the policy.

2. The second point was the one discussed at large in the supreme court, and on which there was a final difference of opinion. The point is whether the determination formed at *Carlsham*, to abandon *Petersburg* and go to *Stockholm*, and sailing for *Stockholm*, was not, under the circumstances of the case, an abandonment of the cargo insured.

A voyage imports a definite commencement and end. It is known and characterized by its *termini*. They are the recognised tests of its identity. It is equally clear that deviation is applicable only while the same voyage continues. Deviation is not a change of the voyage, but of the proper and usual course in performing it. The voyage insured is never lost sight of in cases of deviation, actual or intended. In all the cases of deviation, as Lord *Mansfield* observed in *Wooldridge* v. *Boydell*, (*Doug.* 16.,) the *terminus a quo et ad quem* were certain and the same. Thus, a permission to touch and trade at intermediate ports is understood to be subject to the intention of prosecuting the voyage described, to its specified end. *Semper animo et intentione prosequendi viaggium usque ad finem designatam.* A voyage is always deemed the same, whatever be the deviation, provided the original port of destination be not abandoned. These are plain elementary rules in the law of insurance. And, because the question of deviation always presupposes and admits a continuation of the original voyage, it follows that a mere intention to deviate, whether formed before or after the commencement of the voyage, is no deviation, if the intention was never carried into effect, and the loss happened before the vessel came to the dividing point.

But if the original place of destination be abandoned, in order to go to another port of discharge, the voyage itself becomes changed, because one of the *termini* of the original voyage is changed. The identity of the voyage is gone, and a new distinct voyage is substituted. In that case, intention is every thing, for on that depends the fact, whether the original voyage was, or was not, abandoned. And if the intention to abandon

*IN ERROR.*
......
ALBANY,
April, 1816.

FIREM. INS. CO.
v.
LAWRENCE.

*IN ERROR*
......
ALBANY,
April, 1816.
~~~~~~
FIRFM. INS. CO.
v.
LAWRENCE,

be once clearly and certainly established, (as it is in this case, by the finding of the jury,) it then became perfectly immaterial whether the vessel was lost before or after she came to the dividing point, because, in either case, she was lost, not on the voyage insured, but on a different voyage. .

In my apprehension, this simple statement of the law is sufficient to decide this case.

But in order to give these principles more full and satisfactory illustration, I proceed to observe further, that an insurance relates only to the voyage specially described in the policy. Thus in *Wooldridge* v. *Boydell*, already referred to, the ship was insured from *Maryland* to *Cadiz*, but she cleared for *Falmouth*, and the weight of evidence was, that she sailed for *Falmouth*, without any intention of going to *Cadiz*, and, therefore, Lord *Mansfield* told the jury, that if there was no intention of going to *Cadiz*, they must find for the underwriter, and they did so, although the vessel was lost in the *Chesapeake*, and before she arrived at the dividing point between a voyage from *Maryland* to *Cadiz*, and a voyage from *Maryland* to *Falmouth*.

A distinction has, however, been set up between an intention formed before or after the voyage be commenced, to change the voyage, by dropping the port of destination and selecting another. It is admitted by those who make this distinction, that the intention to change the voyage, and sailing under that intention, discharges the insurer if formed *before* the commencement of the voyage, and that it is no matter whether the loss happens before or after the vessel comes to the dividing point. But it is contended, that if the intention to change the voyage, by changing the place of destination, be formed *after* the voyage be commenced, it is then to be likened to an intention to deviate in the same voyage, and does no harm if the loss happens while the vessel is still on the common track. I am persuaded that there is no foundation for this distinction. The difference between the cases is, that in the one the vessel is in fact sailing on the same voyage, and in the other she is in fact sailing on a different voyage, though she may be for a while on the track common to both voyages. The new voyage was in *the act of performance*, as much before as it could have been after passing the dividing point, and the want of attention to this circumstance has been the source of the error on this subject. If the voyage be abandoned by abandoning the port of destination

IN ERROR.
......
ALBANY,
April, 1816.
~~~~~~~~~
FIREM. INS. CO.
v.
LAWRENCE.

and sailing for another, there is no reason why the underwriter should be holden. It is not a case within his contract. There is no dispute about facts in this case. There never was a clearer case of an actual *bona fide* and decided abandonment of a voyage insured. In an intended deviation merely, there is *no act done* towards a performance of the intention. The same voyage continues, and if there be no actual deviation, there is no abuse of the contract. Here the contract was at an end, by the act of changing the port of destination and sailing on a different voyage, and the justice and legality of the underwriter's claim to be exempted strikes me with entire conviction.

It was urged by the counsel, that the assured might have repented of his new voyage to *Stockholm*, and have reassumed his former one to *Petersburg*, before he came to the dividing point, had not the capture intervened. One of the learned counsel for the defendant in error, seemed to place his principal reliance on this argument, but the truth is, that there was no *room for repentance* in this case, for the captain was placed under a moral disability to make an election, or to exercise any discretion. He sailed under directions from the agent of the assured, not to go to *Petersburg*, but to go to *Stockholm*, and the agent himself was not on board to discharge the captain from this obligation. We are to intend that every man will do his duty. We know it was the bounden duty of the captain to follow his instructions. He was, therefore, in a moral sense, *unable* to go to *Petersburg*; and this court, it is hoped, will always recognise the force of moral obligation. An intention to deviate is nothing; because the intention may be given up before the vessel arrives at the dividing point; but if the captain be under positive instructions to take one course, and not the other, he has no discretion to act, and no liberty to repent. This cause alone is sufficient to discharge the underwriter, and so it was held by the court of K. B. in *Middlewood* v. *Blakes*, (7 *Term Rep.* 162.,) where it was laid down as a principle, that if the captain be tied up by instructions, so that he is not at liberty to exercise his judgment at the dividing point, for the benefit of all concerned, the underwriter is discharged.

But another, and a more captivating argument for the defendant, arises. It has been said that there was no harm done in this case to the underwriter by the sailing for *Stockholm*, for she was taken on the common route to *Stockholm* and *Petersburg*;

IN ERROR.
......
ALBANY,
April, 1816.

FIREM. INS. CO.
v.
LAWRENCE.

and it would have been the same thing, if she had been actually sailing for *Petersburg*. But no such principle is a safe or just rule of decision. An actual deviation, without justifiable cause, is fatal, however short the time, or however short the distance, or however harmless the effect of the deviation. Whether it be for an hour, or a month—for one mile, or one hundred, the consequence is the same. If it be voluntary and without necessity, it puts an end to the contract. It is not the increase of the risk, but the substitution of another risk, that governs the case. These are plain rules on the subject of deviation, and they show that courts do not determine these cases by estimates of the greater or the lesser risk. Even if the risk had actually been diminished by changing *Petersburg* for *Stockholm*, the underwriters would have been discharged, and for this plain, unanswerable reason, that it was not the risk they undertook. The courts are bound to measure out justice to parties according to their own agreements, and not to make agreements for them.

But are we authorized to say, from the case itself, that no harm was done by the change of the voyage? We cannot adjudge that the capture would ever have taken place if the vessel had not sailed for *Stockholm*. She might not have sailed at the very time she did, if she had been bound to *Petersburg*. The gulf of *Finland* might not then have been clear of ice. She might have been obliged to wait at *Carlsham* some days longer, and the privateer might not have been met with. It is very possible, if not very probable, that the loss would not have happened if the voyage to *Petersburg* had not been abandoned. It is this very abandonment of one voyage, and the substitution of another, that may have produced the loss. But I forbear to dwell on such idle considerations. The contract of insurance, like other contracts, is governed by fixed rules, which have respect to the meaning of the parties, and not to calculations of chances.

The true doctrine, on the whole of this subject, with great deference to the supreme court, I take to be this, that the alteration, at *Carlsham*, of the place of destination, by abandoning *Petersburg*, and determining to go to *Stockholm*, and clearing for *Stockholm*, and sailing for *Stockholm*, and binding the master, by positive instructions, to go there, was a *new voyage*, not within the policy; and from that time forward it discharged the un-

IN ERROR.
•••••••
ALBANY,
April, 1818.

FIREM. INS. CO.
v.
LAWRENCE.

derwriter.   I deem this to be the clear, settled sense of the law of insurance in this country, and in every other country where the law merchant prevails.   There is no decision that contradicts this result, and there is much in the books to confirm it.   Thus, in *Norville* v. *St. Barbe*, in the C. B., in 1807, (5 *Bos. & Pul.* 439.,) the counsel for the insurer laid down these propositions, which were not questioned either by the opposite counsel or by the court, " That an intended deviation would not vitiate a policy, if the loss happens before the ship arrives at the dividing point.   That in the case of a deviation the *termini* of the voyage remains, though the course by which the *terminus ad quem* is sought, be changed.   But where the *terminus ad quem* is changed, it is not a deviation, but an abandonment of the voyage ; and such an abandonment, at whatever time it takes place, whether before, or after, the arrival of the ship at the dividing point, discharges the underwriter."

The opinion here given in the C. B., and seemingly acquiesced in, is precisely on the very point now before this court ; and the case of *Blackenhagen* v. *The London Ins. Company*, decided the year after, (*Park*, 226.  1 *Campb.* 454.) appears to me to be a decision on the same principle.   The voyage insured was from *London* to *Revel*.   The vessel arrived in the *Baltic*, and hearing that an embargo was laid on all *British* ships in the ports of *Russia*, she put back first to *Copenhagen*, and then to or near *Gothenburg*.   This was so far considered as justifiable and necessary ; but the ship afterwards sailed for *England*, and in a few days was lost.   There was no point raised about deviation, but the only question was, whether the sailing for *England* was an abandonment of the voyage.   It was admitted, that if going to *England* was the best means of finally getting to *Revel* after the embargo was raised, and that the party so intended, the vessel might still have been considered in the course of the voyage.   But Lord *Ellenborough*, in the first instance, and the court of C. B. afterwards, held, that from the weight of evidence it appeared that the sailing for *England* was a voluntary abandonment of the original voyage, and the underwriter was discharged.   We have also a decision in this country on the same question, and to which decision very great respect is to be given.   It is the case of *Stocker* v. *Harris*, (3 *Tyng*, 409.,) which was decided in the supreme court of *Massachusetts*, in 1807, and prior to the case in *England*.   The in-

surance was on the ship *America*, from *Boston* to the *Canaries*, and at and from thence to any port or ports in *Spanish America*, and at and from thence to her port of discharge in the *United States*. The ship goes to the *Canaries*, and from thence to *Vera Cruz*, in *Spanish America*. So far she was within the policy, and from thence she would have been protected on the voyage to the *United States*. But, at *Vera Cruz*, she takes a cargo and clearance for the *Havanna*, and on her passage to the *Havanna*, but before she had left the track she must have pursued if coming to the *United States*, she was captured and lost. For the underwriters it was contended that the voyage to the *Havanna* was a *new voyage*, undertaken for purposes of profit, and different from an intent to deviate never executed. The very distinction was taken between an intent to deviate on the same voyage, and the sailing on a new one, and that in the latter case it was immaterial whether the vessel had, or had not, arrived at the dividing point. The court took the same distinction, and held that the voyage commenced from *Vera Cruz* for the *Havanna* was a new and distinct voyage, and that the underwriter was discharged, though the loss happened before the vessel came to the dividing point.

I cannot but be persuaded, from the reasons and authorities which have been mentioned, that this is the true exposition of the law on this point, and, consequently, that the judgment of the supreme court ought to be reversed.

VAN VECHTEN, ALLEN, COCHRAN, HAGER, HASCALL, KEYES, and STEWART, Senators, were of the same opinion.

BARKER, Senator, was of opinion that the assured were not bound to make their election at *Gothenberg* of the port of discharge; that if they were, they did, in fact, sail for *St. Petersburgh*; that the subsequent determination, at *Carlsham*, to proceed to *Stockholm*, was, at most, but a mere intention to deviate, the vessel being in the regular route of her voyage; and that as there was no actual deviation, nor abandonment of the voyage, the judgment of the supreme court was correct, and ought to be affirmed.

BATES, BICKNELL, BLOOM, CLARK, CROSBY, DAYTON, ELMENDORF, LOOMIS, PENDERGAST, ROSS, STRANAHAN, SWIFT, TIB-

BITS, and VER BRYCK, Senators, were also of opinion that the judgment of the supreme court ought to be affirmed: and that being the opinion of a majority of the court,* it was thereupon ORDERED and ADJUDGED, that the judgment of the supreme court be affirmed, and that the defendant in error recover against the plaintiffs in error his double costs, to be taxed, &c., and that the record and proceedings be remitted to the supreme court, &c.

*IN ERROR.*
••••••
ALBANY,
April, 1816.

* For affirming, 15. For reversing, 8.
April 3d;

