Ranney, J.
On December 31, a. d. 1837, the defendant in error discounted for the plaintiff the promissory note upon which this suit was brought, and which was made payable at their banking house located in the village of Manhattan, in the county of Lucas. The only question presented for our consideration is, was the defendant in error, the plaintiff below, at that time an authorized or unauthorized bank? If the former, the judgment of the court of common picas is correct; if the latter, it is erroneous.
From the bill of exceptions it appears that the defendant in error was incorporated and authorized to do a banking business at said village, by an act of the legislature of the State of Michigan, passed on March 25, 1836 ; the village of Manhattan being at the time upon the territory then in dispute between this state and the *249 state or territory of Michigan. In January, 1835, the legislativo council of that territory passed an act providing for the calling of a convention to form a constitution and state government, which assembled in May following, adopted a constitution, and submitted it to the people for ratification. It received their approval, and at the same time in pursuance of its provisions, state officers, a general *assembly, and a representative in Congress were elected. The first general assembly convened, under this instrument, on the first Monday November 1, 1835, and at the same session this act of incorporation was passed.
In June, 1835, the legislature of the State of Ohio passed an act erecting the county of Lucas, the northern boundary of which was the present northern boundary of the state, and included within its limits the village of Manhattan, where the bank was to be located. On September 5, 1835, a term of the court of common pleas was held at Toledo, in the township of Port Lawrence, and upon the territory in dispute between Ohio and Michigan. Manhattan was a village in the same township.
After the county of Lucas was erected, a majority of the inhabitants of the township of Port Lawrence acknowledged the authority of this state. All elections after that time were held under the Ohio laws—none were over had in that township under the authority of the State of Michigan. No vote was taken in the township upon the question of the adoption of the constitution, and the authority of the State of Michigan was never recognized by the township as such. In the village of Manhattan there were officers elected under the territorial government, who continued to act until the settlement of the boundary dispute; aud a majority of the inhabitants of that village recognized the authority of Michigan until her admission into the Union.
On June 15, 1836, an act of Congress was passed, entitled “an act to establish the northern boundary line of the State of Ohio, and providing for the admission of the State of Michigan into the Union, upon the conditions therein expressed.” This act established the present northern boundary of this state, and provided that the constitution and state government, which the people of Michigan had formed for themselves, should be accepted, ratified, and confirmed, and the State of Michigan admitted into the Union, upon the express condition that the state should consist of, and have jurisdiction over, the ^territory included within the *250 boundaries thereby established, and none other. These boundaries excluded the village of Manhattan from Michigan. On December 15,1836, the people of Michigan gave their assent to the provisions of this act of Congress, in the manner pointed out by the act itself; and on January 26, 1837, another act was passed by Congz’ess admitting the State of Michigan into the.Union, on an equal footing with the original states; and her senators and representatives, already elected, wmre admitted to seats in Congress.
From this statement of facts, it appeal’s that the act of incoi’poration relied upon, was passed by the genez-al assembly of Michigan, after the adoption of the constitution of that state by the people; and before her admission into the Union by Congress, it attempted to create a corporate body on territory then in dispute between Ohio and Michigan ; which territory, before the discounting of the note in question, was, by act of Congress and the consent of the people of Michigan, settled to belong to, and was brought under the unquestioned jurisdiction of the State of Ohio. To affirm the judgment renderod in this case, by showing the defendant in error an authorized bank, we must be able to settle in its favor the three following pz’opositions:
1. That the general assembly of the State of Michigan, at the time this act was passed, possessed legislative power.
2. That the village of Manhattan was at that time de facto under the jurisdiction and control of that state government; and,
3. Assuming the truth of the two fiz’st propositions, that the Tight to bank, conferred by the law of Michigan, continued in force, and gave the same right to bank in the state after the territory came under our unquestioned jurisdiction.
Before proceeding to consider either of these positions, the following may be laid down as axioms disputed by no one, viz: That the cz’eation of a coz-poration is an exercise of sovereign ^legislative power, and that it can not be done beyond the territorial limits of the state exercising such power.
Did such sovereign legislative power pass the act relied upon by the defendant in ei’ror? is the first question. In accordance with the provisions of the ordinance of 1787, “ for the government of the territory of the United States northwest of the river Ohio,” and under the authority of section 3 of article 4 of the constitution of the United States, Congress, on January 11, 1805, passed an act to oz’ganize the territory of Michigan. It is unnec *251 essary to go into detail, but it is sufficient to say that the territorial government thus provided for, went into operation, and was regularly supplied with a succession of officers in all its various departments, down, at least, to the passage of the act of June, 1835, providing, upon certain conditions, for the admission of Michigan into the union. It is very clear that a territorial and state government could not exist at one and the same time, over the samo territory. Owings v. Speed, 4 Wheat. 714. It follows, therefore, that before a state government, clothed with legislative power, could come into existence, the territorial government must have ceased to exist. The territory was ceded to the federal government, and belongedto the federal government in trust, for the purposes specified in the deeds of session. The territorial government was erected by a law of the federal government constitutionally made, in respect to which the constitution of the United States (art. 6), declares that it “shall be the supreme law of the land, and the, judges of every state shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding.”
Up to the time that the state legislature of Michigan assumed to incorporate this company, this law had not been in any way repealed or revoked by tho power that made it, nor had they agreed to or approved of any state government to supersede tho one created by it. Nor had the territorial government receded from the territory; on the contrary, it was in full life, manned in all its departments by appropriate officers.
*How, then, was this government, created by a “supreme law ” of Congress, brought to a close, and overthrown, so as to make room for the state government, which brought into existence this act of incorporation ? .It is claimed to have been done by the people of Michigan, by the adoption of a state constitution, and the election of officers under it; and further, that this might legally be done, as it was done, without the assent of Congress, or any action on the part of the general government, by virtue of article 5 of the ordinance of 1787. This article, after providing that there should bo formed in the territory.not less than three, nor more than five states, and giving the outline of the boundaries of each, proceeds to say, that “whenever any of the said states shall have sixty thousand free inhabitants therein, such state shall be admitted, by its delegates, into the Congress of the United States, on an equal footing with, the original states, in all respects *252 whatever; and shall be at libert}' to form, a permanent constitution and state government; provided the constitution and government so to be formed, shall be republican, and in confirmitylo the principles contained in these articles.”
By article 4, it is provided that “ the said territory, and the states which may be formed therein, shall forever remain a part of this confederacy of the United States of America, subject to the articles of confederation, and to such alterations therein as shalL be constitutionally made,” etc. These extracts, subject to such modification as the subsequent adoption of the present constitution effected, and especially section 3 of article 4, in relation to the admission of new states, show the relation that this territory bore to the general government, and the rights of inhabitants as to a change from a territorial to a state government. We have seen that the territory, either under state or territorial government, must “forever remain a part of this confederacy.”
To sustain the power of the State of Michigan to legislate before her admission into the Union, wo are referred to the case of Scott v. The Detroit Young Men’s Society, decided by *the Supreme Court of Michigan (1 Doug. 119), and to the same case in the Supremo Court of the United States, 5 How. 343. In this case it became indispensable for the defendants in error to establish two facts: first, that they were duly incorporated; and, second, that they had a deed from the government of the land in controversy. The first they established by an act of the legislature of the State of Michigan, passed on March 26, 1836; and the second by a deed from the government and judges of the territory •of Michigan, under the authority of an act of Congress passed in 1806, executed on July 1, 1836.
The state court, holding that the act of incorporation “ was not invalid, on the ground that the state government had no legal existence until after the admission of Michigan into the Union, .January 26,1837,” and that “ notwithstanding the previous organization of the state government, the governor and judges of the territory of Michigan remained in office until after July 1, 1836.” The reasons for both these conclusions, seemingly contradictory, .are given at length in the opinion. I will not stop to examine them further than to say, that the first is based upon the assumption that article 5 of the ordinance secured, absolutely, thei’igh to the people of Michigan to form a state government whenever the *253 territory contained 60,000 free inhabitants; and that “ that' right could in no way be modified or abridged, or its exercise controlled or restrained by the general government.” The Supreme Court of the United States dismissed the cause for the want of jurisdiction, and hold that “in order to givo this court jurisdiction, tbo statute, the validity of which is drawn in question, must bo passed by a state a member of the Union, and a public body owing obedience and conformity to its constitution and laws,” and that if public bodies, not duly organized or admitted into the Union, undertake to pass laws which might encroach on the Union or its granted powers, they might bo put down under the power to suppress insurrections, or by the penal laws of the states or territories in which they are situated; but that their measures *were not examinable by this court on writs of error. They are not a state, and can not pass statutes within the meaning of the judiciary act.
This decision entirely overthrows the position taken by the court below, and settles the question that Michigan, at this time, was not a state “in this confederacy,” “ owing obedience and conformity to its constitution and laws.” It is insisted that it was no longer a territory. If a state at all, therefore, it must have been one out of “ this confederacy,” in direct violation of the very ordinance to which she appeals. Justices McLean and Nelson dissented from the majority of the court upon the question of jurisdiction. There is nothing to show any difference of opinion between them and the majority, on the main question ; indeed, the view taken by the majority, so far as it has any bearing, greatly strengthens that of the minority. I regard the views taken by Justice McLean of the merits of the controversy, in the opinion delivered by him, in which Justice Nelson concurred, as entirely unanswerable, and adopt them to the fullest extent. He says: “Michigan was an organized territory of the United States. Its governor, judges, and all other territorial officers, were in the discharge of their various functions. The sovereignty of the Union extended to it. Under these circumstances the people of Michigan assembled, by delegates in convention, and adopted a constitution, and under it elected members of both branches of their legislature, governor, and judges, and organized the state government. No serious objection need be made, in my judgment, to the assemblage of the people in convention to form a *254 constitution, although it is the more regular and customary mode to proceed under the sanction of an act of Congress.
“But until the State is admitted into the Union by act of Congress, the territorial government remains unimpaired. No act of the people of the territory, without the sanction of Congress, can change the territorial into a state government. The act to incorporate the Detroit Young Men’s Society, was the exercise of sovereign power—a power totally repugnant to the -Ksovereignty of the Union in its territorial form. This act of incorporation was repugnant to the constitution of the United States, under which the territorial government was organized; it was repugnant to the laws of Congress, which formed that organization ; it was an exercise of sovereignty incompatible with the sovereignty of the Union, in all its legal forms.
“ The two sovereignties of the state and the territorial government can not exist at the same time, within the same limits. The territorial government exists in' full vigor until it is abolished by the admission of the state.”
Satisfied of the correctness of these positions, and yielding obedience to the positive requirements of the constitution of the United States, we hold that the legislature of the State of Michigan, assembled under the constitution afterward submitted to Congress, could not, on March 25,1836, when the act in question was attempted to be passed, rightfully exercise any legislative power whatever.
The next question arising, is, was the village of Manhattan at this time de facto under the control and jurisdiction of this inchoate state government? We have come to the conclusion that it was not a government de jure. The utmost that possibly could be claimed for it, would be, that its acts were binding upon those who lived under and submitted to its authority. No question here arises between this state and the territory of Michigan. A question of that character was raised and settled by this court at its last term, in the case of Daniels v. Stevens’ Lessee, 19 Ohio, 222. It was there held that until the act of Congress of June, 1836, the territory in question ^did not come within the actual jui’isdiction of the State of Ohio. .No doubt is suggested of the correctness of that decision, although it must be confessed that it took a different view of the matter from that constantly maintained by the legislative and executive departments of the government of this *255 state. In June, 1835, the general assembly erected the county of Lucas, and, in the most positive manner, extended the jurisdiction of our *laws to the present boundary of the state, including all the territory in dispute.
Governor Lucas, in his message to the general assembly in December following, says : “Harris’ line has been traced and plainly remarked. The laws of Ohio are in full operation south of that line, and jurisdiction actually- exercised to the same, in accordance with what must be considered, by a careful and impartial examination of the facts, as the established, incontrovertible, constitutional rights of the state.” But it is not enough to make this act of incorporation valid, to show that Manhattan was hot within the jurisdiction of Ohio, but it must at least 'be shown that if was under the actual control, and submitted to the assumed authority of the State of Michigan. Submission to the territorial government is as fatal as though the territory had been in Ohio. As a government can only act through its officers and constituted authorities, their presence, and the exercise of their functions, are commonly the evidence which marks the exertion of authority, and determines the character and extent of the jurisdiction claimed and exercised over the people. The bill of exceptions in this case does not furnish one particle of evidence that any authority whatever was over exercised by the State of Michigan, within the township in which this bank was located; but the contrary is most manifest. They took no part in framing or adopting the constitution. Before its adoption they organized and acted, and ever after held elections under the laws of Ohio, and acknowledged its jurisdiction. They held no elections under the laws of Michigan, and never acknowledged its authority. It is true that a majority of the inhabitants of the village of Manhattan, constituting, however, but a small minority of the township in which it was located, were favorable to Michigan, and recognized her authority; and territorial officers, residing there at the time the township organized under the Ohio laws, continued there until the final settlement of the dispute. There is no evidence whatever, that any state officer was ever within *the township, or that one act indicative of authority by the state, was ever performed there.
We can not, therefore, say, that at the time of the passage of the act in question, the state government of Michigan was defacto in the exercise of jurisdiction over the territory where this bank *256 was located. I have not adverted specially to the question as to what effect the subsequent admission of the state into the Union might have upon her prior legislation, considering it clear that if she had neither rightful nor actual jurisdiction over this territory, and the ultimate settlement of the question left it out of the limits of the state, it could in no way affect this question, whatever might be its effect in places differently situated, and ultimately falling within the limits of the state.
But suppose the two propositions we have already considered were otherwise, and this bank could have been considered as duly incorporated by the law of Michigan, could it still continue to do such business in this state. I am fully aware of the principle by which private rights of property are respected and protected, upon a change of territorial jurisdiction from one government to-another, and fully impressed with the importance of maintaining it unimpaired. But this principle can never be made to extend to mere privileges and capacities created and allowed by the government- from which the territory is taken, especially when they conflict with the policy or municipal regulations of the government to which it is attached. It would hardly be supposed that a license to sell intoxicating liquors, granted to a person residing on this territory while it was under the jurisdiction of Michigan,, would protect him against an indictment under our law, after it fell within our jurisdiction, although his license had not expired.
Indeed, the principle may be still more broadly stated, and it will be found fully sustained by the jurisprudence of every civilized state. While as a general rule it is true that contracts good in the place where made, are good and will be enforced everywhere, still, the rule is always taken with this important ^'qualification, that they are not contra bonos mores, or opposed to the policy, positive law, or criminal prohibitions of the state in which they are sought to be enforced. Story’s Conflict of Laws, 203; 6 Mass. 378; 13 Ib. 1; 8 Martin, 95; 2 H. & J. 193.
This policy each state must determine for herself. The policy of Ohio upon the question under consideration has been settled for nearly forty years, by laws still in force. By the “ act to prohibit the issuing and circulation of unauthorized bank paper,” passed January 27, 1816 (Swan’s Stat. 136), every company or association, issuing notes or bills intended to pass or circulate by delivery, not “ incorporated by a law of this state" was declared to *257 be an -unauthorized, bank. Any person acting as an officer, or knowingly receiving or passing their notes, was made liable to indictment, and subjected to severe penalties; while “all bonds, bills, notes, or contracts,” made payable at or to such bank, were “declared null and void.”
Now it will not be doubted that it was competent for the legislature to have allowed all persons to bank, or to have prohibited all; or to do as they have done, allow all “ incorporated by a law of this state,” and prohibit all others. The policy of this legislation is perfectly obvious. They intended to guard the community against fraud and imposition, by exacting of persons engaging in.1^ this business, the proper security before they were suffered to enter upon it, and to make them directly amenable for abuses, to our own laws. This policy would be entirely subverted by allowing institutions created by the laws of other states, and beyond our control, to do business here. The defendant in error is claimed to have incurred one of the penalties óf this act, to wit: the forfeiture of the debt sued upon. She admits that she was engaged in the business of banking at the time she took the note in suit, but claims to have been authorized to do so, not “ by a law of this state,” but by a law of the State of Michigan, which she brought with her, and so far repealed our restraining and criminal *laws. ¥e can not acknowledge the right to make any such importation. To do so would be pressing the doctrine of comity between states, to a point beyond where it has ever been carried, and to the subversion of the rights and interests of our own citizens, and of our long settled internal policy. Sitting here to administer the laws of this state, we can not make exemptions to their operation which the law itself has not made, and as this case does not fall within any prescribed exemption,' we have no power to prevent its falling under the operation of the statute.
The court of common pleas erred in overruling the motion for a new trial, and in entering judgment for'the plaintiff below, and for that cause, the judgment is reversed.
Hitchcock, C. J., was absent.
An action can not be sustained in the courts of a state on an agreement entered into in violation of the laws of the United States, or of the laws of the particular state. Note to Chitty on Contracts, citing 4 Dall; 6 Binn. 321; 4 *258 S. & R. 159; 4 Dall. 308;. 2 S. & R. 317; 14 Johns. 46; 5 Day, 542; 1 Yeates, 483; 8 Johns. 304; 4 Rawle, 185; 1 West. Law Journal, 261.
As to contracts, etc., in. Ohio, void in violation of law; illegal executorycontracts not inforced; par-ties to illegal executed contracts not aided, etc., see Moore v. Adams, 8 Ohio, 374; Roll v. Raquet, 4 Ohio, 418 ; Raquet v. Roll, 7 Ohio, 77. [But where a person has been fraudulently induced by threats of a groundless prosecution to execute a note, chancery will enjoin collection, 18 Ohio, 548.] Seymour v. Turnpike Co., 10 Ohio, 476; Nichols v. Poulson, 6 Ohio, 305; Chaffee v. Garrett, 6 Ohio, 421; Spingeon v. McElvain, 442; Gill-man v. Lewis, 12 Ohio, 281; 6 Ohio, 21.
A statutory imposition of a mere penalty upon the performance of an act, as the sale of town lots before plat recorded, does not necessarily vitiate the contract itself. 9 Ohio, 201.
Sundry contracts—Sellers v. Dugan, 18 Ohio, 493 , Brown v. Timmany, 20 Ohio, 81. Illegal contracts in relation to interest—8 Ib. 257; 11 Ib. 489, 498, 417; 10 Ib. 378; 12 Ib. 153, 544; 17 Ib. 605, 336; and see Wilcox Dig.; 2 Swan’s Practice, 915; Curwen’s Cases Overruled, 6; and see Collins v. Blantern, 2 Wils. 341; Ward v. Lloyd, 7 Scott N. R. 499; Prole v. Wiggins, 3 B. N. C. 230 ; Paxton v. Popham, 9 East, 408; Id. 417; 5 B. N. C. 666 ; Cuthbert v. Haley, 8 Term, 390; 6 Term. 16; 1 Term, 734; 3 Ib. 422; 2 B. & A. 368, etc., cited in Broom’s Legal Max. 351.