## BIDDIS administrator of BIDDIS against JAMES.

### IN ERROR.

1814.

*Philadelphia,*
*Monday,*
*July 25.*

ERROR to the Common Pleas of *Wayne* county.

The action in the Court below, was brought by *Otto James* against *George Biddis* administrator of *John Biddis*, to recover 10,000 dollars, the amount of a prize drawn by the plaintiff in a lottery made by the intestate in his life time, but not drawn till after his death.

The act under which the lottery was formed, was passed on the 20th *January* 1806, entitled " An act authorizing " *John Biddis* to vend his patent rights, for manufacturing " potatoe starch, sago and hair powder, and for opening or " reducing offcast woollen clothing to wool;" and contained but one section, in the following words: " That it shall be " lawful for *John Biddis* to vend his aforesaid patent rights " *for eighteen months from the date hereof*, according to a " plan to be by him lodged with, and to be approved of by " the Governor of this Commonwealth; he the said *John* " *Biddis* giving the necessary sureties for the faithful per- " formance in the premises, and for a full and complete dis- " closure and exemplification of his patent rights, at the end " of the said term of eighteen months, any law to the con- " trary of this act notwithstanding."

On the trial of the cause, it appeared that *John Biddis* submitted the plan of a lottery to the governor, and that it was approved by him within eighteen months of the date of the law. *John Biddis* in his life time signed about 1000 tickets, and authorized his son *John* to sign tickets in his name, which he did in the life time of his father to the amount of about 35 or 37,000 more. The intestate died in *March* 1807, and after his death the defendant and the family concluded to proceed and complete the business. On the 8th *February* 1808, the governor commissioned persons to superintend the drawing of the lottery; and in that winter *John Biddis* the son, with the concurrence of the defendant, signed tickets in the name of his father to the amount, including those previously signed, of about 124,000, of which between 80 and 100,000 were put into the wheel. The tic-

An edition of the laws, published under the authority of the legislature, is evidence as well of the *private* as of the *public* laws it contains.

In a suit to recover a prize drawn in a lottery, the scheme of the lottery and a copy of the bond for complying with the law, filed in the secretary's office and copied into the book of executive minutes, are evidence against the proprietor of the lottery, without proof that he had executed the bond or deposited the scheme: it being at the same time shewn that there was no other bond or scheme in the office,

The oath of a person who attended the drawing of a lottery, is the best evidence that a particular number drew a certain prize.

A ticket in a lottery, sold after the time limited by law for completing the sales, confers no right to recover the prize that may be drawn against it.

ket of the plaintiff, as was the case with all those produced, bore date the 1st *April* 1806. The drawing commenced on the 23d *February* 1808, and ended on the 1st *August* 1809, on which day the plaintiff's ticket drew a prize of 10,000 dollars. Many witnesses were examined to shew that the plaintiff's ticket was issued after the expiration of the eighteen months, and to prove that the signature was not that of *John Biddis* the intestate; other witnesses were produced to repel this testimony, and to shew that *James* had purchased this and seventy-nine other tickets, without any knowledge of the defendant's proceedings.

The plaintiff in the course of the trial offered, 1. a printed copy of the act of 20th *January* 1806, contained in a pamphlet of the laws, purporting to have been printed by *Francis Bailey* in the year 1806, under the direction of *T. M. Thompson*, secretary of the Commonwealth, in pursuance of a resolution of the legislature. 2. A paper writing purporting to be a scheme of a lottery signed *John Biddis*, and proved by a clerk in the office of the secretary of the Commonwealth, to have been found on the files of that office, and by him copied into the book of executive minutes; and that it was the only scheme of a lottery found in that office purporting to have been signed by *John Biddis*. 3. Two bonds purporting to be signed and sealed by *John Biddis* and others, in the presence of two witnesses, and proved by the same clerk to have been found on the files of the secretary's office, with the said scheme of a lottery, and copied into the book of executive minutes. 4. A journal of the drawing of the lottery, proved by the deposition of *Michael Fortune* to have been truly kept by him from the commencement to the termination of the lottery, and by which it appeared that the plaintiff's ticket drew the prize in question.

To all these the defendant's counsel objected, but the Court overruled the objections, and finally charged the jury, that according to the act, *John Biddis* had only the power of vending his patent rights during the eighteen months, that it was exceedingly improper for the administrator to sell after that time, and that the District Court for the city and county of *Philadelphia* had decided correctly in refusing to compel a payment for tickets purchased after that time from the agent of the lottery. But that the plaintiff came honestly

by the ticket, without any knowledge of the circumstances, that the misconduct was entirely on the part of the defendant, and therefore if the jury were of opinion that the plaintiff acquired the ticket innocently, he was entitled to recover the prize with interest, although the ticket should have issued after the eighteen months, in consequence of the fraud and artifice practised by the defendant.

Bills of exceptions were tendered to the opinions of the Court upon the evidence, and to the charge.

*Sergeant* and *Ingersoll* for the plaintiff in error.

1. The pamphlet of the laws was not evidence, because the act in question being a *private* act, of which the Courts do not take notice, the only mode of proof is by an exemplification from the Roll's office, or by a sworn copy. *Gilb. Ev.* 10. 12., *Peake* 26. The pamphlet was evidence of the public laws merely. In the *Commonwealth* v. *Frazer and Porterfield*, tried before the *Chief Justice* and *Yeates* J., at an Oyer and Terminer in *January* 1813, it was decided that the printed copy of a law of *Delaware*, published by authority of the state, was not evidence of a private act. The opinion of C. J. *Marshall* in 4 *Cranch* 384, was *obiter*.

2. 3. The scheme should have been proved. There was no evidence that it had been placed in the office by *Biddis* or by any one for him, nor was his handwriting to it proved. This was the very foundation of the plaintiff's suit, and better evidence was in the power of the party than he furnished. The same objection applies in a great degree to the bonds. There was no evidence of the handwriting of witnesses or parties.

4. The journal was inadmissible, because the drawing was illegal; most of the sales, and the whole of the drawing, having taken place after the death of *Biddis*, whereas the lottery was a personal trust in him.

5. The charge of the Court was clearly wrong. In the first place because the fraud of the defendant, if he was guilty of any, could not make the estate of the intestate liable; and the judgment here is against the estate of the intestate, the defendant being sued in his representative character. In the next place, because there was no cause of action upon a ticket issued after the eighteen months. By the act of 17th *February* 1762, lotteries are declared to be

1814.

BIDDIS
*v.*
JAMES.

common nuisances. A penalty of 500*l.* is inflicted upon the maker, and 20*l.* on the purchaser, of a ticket. The act of 20th *January* 1806 gave to *Biddis* the right to sell his patent rights, by lottery, only for eighteen months after the date. After that the sale of tickets was illegal, and passed no right. A bond for the price of them was held in the District Court to be void. *Barton* v. *Hughes* (*a*). Whatever might have been the conduct of the respective parties, no court of this Commonwealth can do less than refuse their aid to the plaintiff, because the contract was in violation of a public law. *Maybin* v. *Coulon* (*b*), *Mitchell* v. *Smith* (*c*), *Hunt* v. *Knickerbacker* (*d*). In addition to this limitation of time in the law, there is a personal limitation to *Biddis.* Neither the act nor the nature of the trust extends to administrators. *Biddis* could not have assigned the privilege; it could not have been taken in execution; it was not assets in the hands of executors. Where the law intends to embrace representatives, as in the case of copyrights and patents, it names them. 1 *U. S. Laws,* 118., 2 *U. S. Laws* 200. It follows from this that a sale within the eighteen months, but after *Biddis's* death, passed no right. The act of 21st *March* 1806 has nothing to do with the case. It only prevents the application of the common law to cases provided for by the act of assembly, further than may be necessary to carry the act into effect. Here the act of 1762 can not be carried into effect without defeating the contract.

*J. Ewing* and *Tilghman* for the defendant in error.

1. There is no difference between public and private laws, when both are printed by public authority. The printed book is as high evidence, as an exemplification under seal. The reason why in *England* a distinction has been taken, is because private statutes are not printed by the king's printer, and the judges it is said take notice of public statutes, and only refresh their memories by the book. Where however a private statute is so printed, in consequence of its relating to many persons, as to a whole county, it may be read from the statute book even in that country; 2 *Bac. Abr.* 609; and in our own state, this distinction between public and private statutes was done away in the case of

(*a*) 2 *Browne* 48.          (*c*) 1 *Binn.* 110.
(*b*) 4 *Dall.* 269.          (*d*) 5 *Johns.* 327.

*Thompson* v. *Musser* (*a*), where the Court received after full argument the printed laws of *Virginia* as evidence of a public statute, of which at the same time, being the law of another state, the judges certainly could not take notice, more than of a private law. In *Young* v. *The Bank of Alexandria* (*b*), C. J. *Marshall* considers a private law to be well proved by a copy of the laws printed by public authority.

2. 3. The scheme was the only one in the office, and therefore as *Biddis* had made a lottery, which was drawn, and the plan of which he was bound to lodge with the governor, this circumstance was at least presumptive evidence that the scheme was placed there by him. His signature to it was unnecessary. So as to the bonds. In an action upon them, it would have been necessary to prove them; but when the only question was whether they had been deposited in conformity with law, their being genuine or not was of no importance between these parties.

4. Whether the drawing was lawful or otherwise, the journal supported by oath was the best evidence of the fact, that the plaintiff's ticket drew the prize.

5. The charge of the Court is not liable to the objections which have been raised. The act extended to the administrators of *Biddis*, because it was a trust coupled with an interest. If he had sold many tickets in his life time, and then died, the purchasers might have insisted upon a drawing, and what injury could arise, or what difference did it make, to the public? The charge of the judge must be taken altogether. There was enough before the jury to shew that the ticket was sold within the eighteen months. But if not, still it does not follow that the sale was void. It was not the intent of the law that *Biddis* should be absolutely restricted to that time. The lottery was concluded within a reasonable time. In the *Earl of Salisbury* v. *Bennet* (*c*), a legacy of 20,000*l.* was to be reduced to 10,000*l.* unless the legatee married *after* sixteen, and with the consent of three persons; she married with their consent, but *before* sixteen, and the full legacy was decreed, the time being only a circumstance. Lapse of time in tendering a conveyance or the like, is constantly relieved against. *Gibson* v. *Patterson* (*d*). If however the time is essential, and the contract would have been void by the operation of the common law upon the act of

(*a*) 1 *Dall.* 463. 　(*b*) 4 *Cranch* 384. 　(*c*) *Skinn.* 285. 　(*d*) 1 *Atk.* 12.

1762, yet since the act of 21st *March* 1806, 4 *Smith* 332, the Court cannot declare it void, because the act first mentioned provides another remedy, namely a *penalty of* 20*l.*, and by the act last mentioned the penalty of the common law cannot be applied, where the statute has created one.

TILGHMAN C. J. The record contains two bills of exceptions, the first relating to four several papers offered in evidence by the plaintiff and admitted by the Court, the second to the charge of the Court. These shall be considered in their order.

1. The first paper objected to was a copy of the act of assembly, printed by the public printer under the direction of the secretary of the Commonwealth, who was authorized by the legislature to compare the copy with the original roll. By the law of *England,* the copies of the public laws printed by the king's printer, are read in court, not as evidence, but as bringing to the mind of the Court, a matter which every man is supposed to know, because every man is a party to the public laws, having consented to them by his representative. But a private law is to be proved as any other matter of fact. This distinction between public and private laws, is by no means satisfactory, when applied to the actual state of the world. Whatever reason there might be for supposing that every man knew the law in ancient times, when laws were few and short, and at the end of each session a copy of the laws was sent to the sheriff of every county, who made public proclamation of them at the county court, and suffered the people to read them and take copies at their pleasure, 1 *Bl. Comm.* 185, yet there is no ground for this supposition at present, when laws are numerous, long and intricate, when they are not published by proclamation, and when in fact, neither the people, nor even the judges, have any opportunity of knowing them but from printed copies. It is for this reason that it has been usual for the legislatures of the several states to have the laws printed *by authority.* Confidential persons have been selected to compare the copies with the original rolls, and superintend the printing. The object of this provision was to furnish the people with authentic copies; and from their nature, printed copies of this kind, either of public or private laws, are as much to be depended on as the exemplification, veri-

fied by an officer who is the keeper of the record. In *England* there is no provision by parliament for the publication of their laws. They are printed by the king's printer. There ought therefore to be a difference in the law of evidence respecting *printed copies* in the two countries. And we find that when the subject has been presented to the minds of the *American* judges, they have not failed to be struck with the difference. In the case of *Thomson* v. *Musser*, 1 *Dall.* 463, this Court admitted the printed copy of a *Virginia* act of assembly. This decision abolished the distinction between public and private acts, because it could not be supposed that the people of *Pennsylvania* were acquainted with the *public laws of Virginia*, having never made or consented to them either in person or by representative. In *Young* v. *The Bank of Alexandria*, 4 *Cranch* 388, the subject was brought before the Supreme Court of the *United States*, when Chief Justice *Marshall* expressed his opinion, that whether the law were public or private, yet being printed by the public printer, by order of the legislature, agreeably to a general act of assembly for that purpose, it must be considered as sufficiently authenticated. He declared indeed at the same time, that the Court would not prevent counsel from arguing the point, if they thought they could support the contrary opinion, but the counsel declined the attempt. This opinion of Chief Justice *Marshall* appears to me to be perfectly correct. I am for admitting the printed copies, *authorized by the legislature either of this or any other state, whether the laws be public or private.*

The two next papers received in evidence, I shall consider together, as they fall within the same principle. One was the scheme of a lottery signed by *John Biddis*, the other a bond of *John Biddis* with securities. Neither the execution of the bond, nor the signature of *John Biddis* to the scheme, was proved; but it was proved that these papers were found on the file of the secretary's office, and copied by the clerk into the book of executive minutes, and that there was no other scheme of *Biddis's* lottery to be found in the office. In an action on the bond, it would have been necessary to prove its execution. As to the scheme, it was not essential that the name of *Biddis* should be signed at all, and therefore this paper being found in the office, and no other paper of the kind being there, the presumption was

very strong that it was the scheme submitted to the governor in compliance with the act of assembly. With respect to the bond, the presumption was equally strong of its having been deposited by *Biddis*, and if deposited by him, I take it to be immaterial in the present action whether he executed it or not. For if he had deposited a forged bond, and thus imposed on the governor, he would not be permitted to avail himself of this plea, in bar of actions for the recovery of prizes in the lottery which he had proceeded to draw.

The fourth paper was clearly evidence. It was a journal of the drawing of the lottery verified by the oath of the person who kept it. Whether the lottery was *legally drawn* was another question. But it was incumbent on the plaintiff to prove, that his ticket drew the prize of 10,000 dollars; and there could be no better way of proving it than by the oath of a person who attended the whole drawing, and kept a written account of the proceedings.

The exception to the charge of the Court remains to be considered. The judge was of opinion, that the act of assembly having confined the license to vend the patent rights to the term of eighteen months, no ticket could legally be sold after eighteen months, because the sale of tickets was the mode adopted for the sale of patent rights; yet he charged, that it was immaterial in the present action, whether the sale of the ticket was within the eighteen months or not, because the plaintiff having come fairly to the ticket, the defendant should not avail himself of his own fraud in selling tickets contrary to law. In the first place, as the legality of selling or of purchasing these tickets depended on an act of assembly, it was the fault of the plaintiff to purchase; nor could any fraud which the defendant could practice, prevent the plaintiff, if he had used due caution, from knowing that the eighteen months limited by law had expired. But were it otherwise, the fraud of the defendant is not sufficient to support this action, which is founded on the assumption of the intestate. This issue is joined on *his* assumption, and the judgment is against *his* estate. So that to support the action on the ground of fraud in the defendant, would be to punish one man for the offence of another. It was urged also in support of the action, that the limitation of eighteen months was but a *circumstance*, against which the Court may relieve by extending the time. I cannot think so. It is a cir-

cumstance to be sure, but a very material one, a substantial part of the terms imposed by the legislature, which it is not in the power of any court to alter. But it has been contended, that granting the drawing of this lottery to have been contrary to law, yet the action is maintainable; because by the act of 17th *February* 1762, a penalty is imposed on both buyers and sellers of lottery tickets, and by the act of 21st *March* 1806 it is enacted, that " in all cases where a reme- " dy is provided, or any thing directed to be done by any " act of assembly, the directions of the said act shall be strictly " pursued, and no penalty shall be inflicted, or any thing " done, agreeably to the provisions of the common law in " such cases, farther than shall be necessary to carry such " act into effect." The construction contended for by the plaintiff, gives this provision a very unnecessary and inconvenient extent, and one which is greater than the words require. The act of *February* 1762, not only inflicts penalties on the buying and selling of tickets, but expressly enacts, " that all lotteries whether public or private are " common and public nuisances, and against the common " good and welfare of this province." So that to give efficacy to this provision, it is at least *useful* to call in that principle of the common law, which forbids the courts to take cognizance of an action founded on a flagrant breach of law. This is not the inflicting of a penalty, or doing any thing different from or more than is enacted. It is but a negative interference, to prevent a public injury, and to carry the law more effectually into operation. The construction has been settled already in this court, in the case of *Primer* v. *M'Connell*, and in the District Court in the case of *Barton* v. *Hughes.* In both these cases, it was decided that an action could not be supported for the price of a ticket in a lottery, which was not authorized by law. I am of opinion upon the whole, that there is no error in the points mentioned in the first bill of exceptions, but that there is error in the charge of the Court, for which the judgment should be reversed, and a *venire facias de novo* awarded.

YEATES J. and BRACKENRIDGE J. delivered their opinions, in all points concurring with the Chief Justice.

Judgment reversed.