The Judges this day delivered their opinions seriatim.
Tilghman C. J.
This is an action brought on a promissory note given by Seidenbender and Stoner to Joseph Charles deceased, for one hundred and thirty dollars, to be paid, “ on the delivery of a deed in fee simple to the drawers of the note, for such lot of land as shall be drawn against certificate No. 102, purchased by them in the town of Blue Rock, on the eastern bank of the Susquehanna river.” The defendants contend, that they are not bound-to pay this note, because it was given on an illegal consideration, to wit,-on the purchase of a ticket in a lottery made by Joseph Charles de^ ceased, for the sale of a tract of land called the Blue Rock Tract. By an act of assembly passed' 17th February, 1762, lotteries ,are declared to be “ public nuisances, and against the common good and welfare of this province.” If the lottery under which this ticket was sold, be within th.e act of assembly, the consequence must be, that this action cannot be supported, because it would ill become a court of justice to lend its aid to a transaction declared by the legislature to be “ against the common good and welfare of the state.” It was formerly a question, whether an action would not lie in cases where a penalty was inflicted by statute, but the contract was not expressly declared to be void. But both in England and in this country, that question has been long at rest. It is unnecessary to cite English authorities, because the matter has been fully considered and decided, in out own Courts. In Mitchell v. Smith, 1 Binn. 110, it was determined, that there could be no recovery on a bond given for the consideration money of a tract of land- in Luzerne county, sold by the obligee to the obligor, under a title derived under the state of Connecticut. The sale was against the interest, the policy, and the dignity of the Commonwealth of Pennsylvania, by setting up a title derived from another state, to land lying within the bounds of Pennsylvania. Such sales were forbidden by act of assembly ; but there was no act by which this bond was declared to be void. About the same time, it was decided by this Court, in the case of Maybin v. Coulon, that an action could not be supported, on a con *160 tract which was connected with a breach of the laws of the United States, in covering a ship, the property of a foreigner, in the name of a citizen of the United States ; and since that, in the case of Biddis v. James, 6 Binn. 321, it was held, that no action would lie, founded on a sale of a lottery ticket, and the same point was decided in Primer v. M'Connell. The same principle was adopted by the Supreme Court of New Tork, in the case of Hunt v. Knickerbocker, 5 Johns. 327. So that I consider it as perfectly settled, that an action cannot be sustained, founded on a transaction prohibited by statute, although it be not expressly declared that the contract is void.
The only question then is, whether the transaction in which this ticket, or certificate, was sold, is prohibited by an act of assembly ? for the plaintiff contends, that it is merely a sale of a tract of land, for an adequate consideration, not forbidden by any law, nor in its consequences injurious to the common welfare. Let us consider, whether this be really the nature of the case. A man possessed of a tract of land on the banks of the Susquehanna, devises a scheme for selling it, at the rate of about 2000 dollars an acre. It will not be seriously contended, that the whole tract was, in truth, worth the whole sum to be produced by the lottery. In order, therefore, to induce people to become purchasers, they were to be allured by the prospect of gain. But this gain depended upon chance, which is the essence of a lottery. All tickets were sold for the same price; but the lots were of very unequal value. One, on which a dwelling house was erected, was valued at 11,000 dollars. Another, on which there was a barn, was valued at 3000 dollars. Two others had wooden buildings on them. There was a range of lots on the river, peculiarly valuable from their situation. But the great mass which lay back from the river, and had no buildings, bore no proportion to the price at which the tickets were sold. In what then, does this differ from a common lottery, except that in one case the holder of a ticket receives money, and in the other, land ? If it be said, that in this case, there are no blanks; I answer, that no material difference arises from that circumstance. Some of the most fraudulent lotteries ever known, have been those in which there were no blanks. They are an imposition on the folly of mankind; for, of what importance is it, if a man, who pays a consider *161 able sum for a ticket, has a prize of very little value.. In the present instance, a ticket is sold for three hundred and thirty dollars, and the holder is not certain of receiving more than between one-sixth and one-seventh part of an acre. It is urged in its favour, that sales of 'this kind have been very common, , , . , ,, , ... , ■ • and much property is held under such titles. 1 am not giving any opinion on cases, where the parties have thought proper to carry the contract into effect. The present question is, whether the purchaser of a ticket can be compelled to pay for it. If we decide that he cannot, it will put an end to a wide spreading mischief, without affecting the security of titles. The act of assembly declares, in express terms, that a all lotteries whatever, whether public or private, are common and public nuisances, and against the common good and welfare.” Is not this a lottery ? No, say the plaintiffs ; it is no more than a partition by lot, of a tract of land, of which all the purchasers of tickets, were tenants in common. But this is directly contrary to the truth ; for, until the lottery was drawn, no purchaser had any right to any part of the land ; and when it was drawn, they took very unequal interests, designated by the chance of the wheel. When tenants in common make partition, they are seised of the whole estate before partition, and the object of the lots is, to assign to each his particular portion, the whole having been previously divided into parts as nearly as possible of equal value. The two cases are so extremely dissimilar, that the mind is struck with the difference, before it can frame an argument to prove it. Neither have the' plaintiffs succeeded better in their comparison between this lottery, and that made by the proprietaries of Pennsylvania in April, 1769, when they opened their office for the sale of the land purchased of the Indians at the treaty at Fort Stamvich, in November, 1768. The proprietaries wished to place all purchasers on an equal footing. . All the lands were offered at the same price per acre. But it was foreseen, that there might be several applicants for the same tract, and the only object of the lottery was, to decide by fair chance, who should have the preference in such cases. Every one who wished to purchase, put in an application describing the land. On the putting in of his application, he paid the proprietary officers, a fee of seven shillings for their trouble, but not one farthing for the land. All applications were put in one wheel, and *162 the priority of each was decided by a number drawn from another wheel. Those who did not get the tract they wanted, paid nothing; and even the fee to the officers was not thrown away ; for it was the practice to permit the unfortunate aPP^cants t0 ta¡ce up vacant land in any other place, without paying new fees. It is not possible, therefore, for any two things to be more .unlike, than the proprietary lottery and the lottery of Joseph Charles. Barely to state the circumstances of each, is sufficient to shew their difference. But it has been argued on the part of the plaintiff, that the act of 1762, was confined to lotteries concerning personal property; that land lotteries not being at that time in practice, no evil arising from them could have been in contemplation ; and that this appears from the legislature’s having adopted the expressions of the English statute of Wm. III. against lotteries of' personal property, but neglected the statute of Geo. I. against land lotteries.
Upon the perusal of our act of assembly, we perceive an intent to cut up lotteries of every kind by the root; and for this purpose, it is enacted in the first section, in the most comprehensive terms, that all lotteries -whatever, -whether public or private, are common and public nuisances, &c. This was the wisest course that could be taken. For, it being impossible to foresee all the different schemes that, ingenuity might devise, it would have been dangerous to enter into an enumeration of particulars. But having destroyed all lotteries by the sweeping expressions in the first section, the act proceeds in the second section to describe certain kinds of lotteries, in pretty general terms, for the purpose of inflicting a penalty on the offenders. In this section, which is evidently drawn after the English statute of 10 and 11 Wm. ill. ch. 17, a penalty of 500 pounds is imposed on persons “ who shall publicly or privately set up, erect, make, exercise, keep open, shew, or expose to be played at, drawn, or thrown at, any lottery, play, or device, or shall cause or procure the same to be done, either by dice, lots, cards, balls, tickets, or any other numbers, or figures, or in any other manner or way whatsoever.” The lottery of Joseph Charles is within these words, for he did publicly set up a lottery, to be draivn at, by numbers, or Jigures. But even if the case w.erenot embraced by the second section, it clearly is so by the first, which would be sufficient to prevent the plaintiff’s recovery; for, the gene *163 ral position in the first section, of all lotteries being a nuisance, &c. is not diminished, or impaired, by the second section, ■which imposes penalties in certain cases. As to the argument drawn from the statute 8 Geo. II. ch. 2. which our act has not copied, there is no force in it, for, although it is true * » ’ 1 that this statute expressly mentions lotteries for the sale of lands, &c. and that such lotteries are not expressly mentioned in the statute of Wm. III. yet it by no means follows, that these lotteries were not comprehended in the prohibition of the statute of Wm. III. Nay, the opinion of the British parliament seems to have been, that they were comprehended, because the statute of Geo. II. imposes penalties, “ over and above any former penalties inflicted by any former act or acts of parliament?'’ Upon the whole, it appears, that the lottery of Joseph Charles, falls within the .words of the act of 1762j it appears also, that it is within the intention of the act, because it tended to the impoverishment and ruin of many persons. I am, therefore, of opinion, that no court of justice should suffer an action for the price of a ticket, to be maintained, because that would be, in effect, giving aid to an illegal transaction. It follows, that the judgment of the Court of Common Pleas should be reversed.
Gibson J.
Undoubtedly this is a lottery transaction. Property, either real or personal, may be divided by lot, without incurring any penalty imposed by the different acts of assembly, prohibiting unauthorised lotteries; but then there must be a previous existing interest in the thing thus divided. Here no interest vested till the lottery was drawn, and the same circumstance that vested it, at the same time attached it specifically and exclusively to the property acquired. For what purpose was this ticket purchased, but to acquire an interest in property ? It is idle, therefore, to say the purchasers of • tickets, were tenants in common, of'the whole property intended to be thus disposed of, before the drawing commenced, and that the drawing was merely intended to separate the particular interests of each, and was merely a mode of partition. It is not onlythe drawing of a lottery that is prohibited ; the purchase or sale of tickets with a view to such drawing, is equally so. But if the law had not prohibited the purchase of tickets, no interest would have vested by the purchase only, for the contract did not look to an interest in *164 common; by its terms, the holder of a ticket, was to have such lot as should, be drawn opposite to its number, and nothing else. Nor does the circumstance of the scheme being without blanks, vary the nature of the transaction. A great proportion of the prizes, when considered in relation to the price of the tickets, were nothing more than nominal. In this respect there can be no difference, between a lottery where the object is land, and one where it is money. If the absence of blanks were sufficient, it would be easy to evade every prohibition on the subject. The act of 1762, forbidding all lotteries public or private, was intended to protect the unwary from a spirit of gambling, regardless of the dictates of prudence, .which the prospect of adventitious and inordinate gain, most usually excites. Would not the inducements to adventure be increased, by the deceptive consideration, that the price of the ticket would not be wholly lost ? But it is said, that although this may have been a lottery, still it is not within the purview of the act of 1762. It clearly is within the letter of the enacting clause. I grant, the legislature may not have had this particular kind of lottery in view ; but, was it intended to restrain the operation to those particular kinds of lotteries then in use, and to those only? I apprehend not. It is very clear, that a particular kind of mischief, differing not in form or substance, but in degree only, from the one under consideration, and only less pernicious in its consequences, first induced the legislature to act on the subject. Shall the letter, which is sufficiently comprehensive to embrace this case, be restrained to the particular mischief then existing, and exclude one of the very same stamp, merely because it was not then practised ? This surely would not be a sound construction. The key of the construction of a statute, is the intention of the legislature; and I readily admit, that cases, seemingly within the letter, have been excluded, and, indeed, the act construed in direct opposition to the letter, to attain that intention, where it was dear beyond dispute. The intention may be collected by a consideration of the cause and mischief that led to the enactment of the law ; by comparing one part of it with another, and judging from a view of the whole ground ; and sometimes from extrinsic circumstances. What would the legislature have said, if the case of a lottery, such as the present, had been put to them ? Surely not that they intended, by re *165 citing in the preamble, the particular mischief that produced the law, to qualify and restrain the general and comprehensive expressions in the body of the act, and exclude cases, generically the same .in their nature and consequences, merely because they happened not to be specifically enumei . . r n i tt , rated, or were not then in existence. In Bole v. Horton, Vaugh. Rep. 373, it is laid down, that where the tvords of a law extend not to an inconvenience rarely happening, and do to those which often happen, it is good reason not to strain the words further than they reach ; but it is no reason, if the words do enough extend to an inconvenience seldom happening, that they should be restrained, because it happened not more frequently. 19 Fin. tit. Statutes, E. 6. pi. 69, 70. This last is precisely in point. Nothing can be more extensive than .the words of the act of assembly. All lotteries whatever, whether public or private, are declared common nuisances, and penalties are imposed on any person, who shall set up “ any lottery, play,, or device, by dice, lots, cards, balls, tickets, numbers, or figures, or in any other manner, or way whatsoever.” Now, what was the mischief intended to be rethedied ? The preamble recites, that many mischievous and unlawful games-, called lotteries, had been set up in the province, tending to the corruption of youth,' and the ruin and impoverishment of poor families, and that such practices, not only gave opportunities to evil disposed persons, to cheat and defraud the honest inhabitants, but proved introductive of vice, idleness, and immorality, against the common good and welfare of the province. Have not ail lotteries, whether on a great or small scale, whether the price of the tickets be high or low, directly and inevitably this tendency ? This law was not made for the exclusive protection of minors and poor families; it was made to prevent the introduction of vice, -idleness, and immorality, in whatever shape they might flow from this contaminating source. It is of no consideration, that the price of tickets was so high, in this instance, that all but people of wealth above mediocrity, were precluded from adventuring. We know from experience, that when a spirit, of speculation, or desire of inordinate gain, infects the rich, it terminates in scenes of ruin and devastation, as wide spreád, and deplorable in their consequences of misery and want, in the domestic relations of life, as if it had been confined to those who had *166 comparatively little to lose. Then, is not a lottery of this sort, within the mischief intended to be prevented ; and if it "also be within the letter, on what principle can we say the act does not extend to it? We are bound to extend it to every case within the letter, which we can suppose, would, if foreseen, have been specially provided for, and will any one say the legislature, if it had foreseen the existence of these land lotteries, would have excepted them from the operation of the general provisions of the act. The preamble will not always serve as a guide to the construction of the purview, much less control it. Barker v. Reading, 1 Jones’s Rep. 163; Palm. 485; The King v. Athos, 8 Mod. 144. The true rule seems to be, that where the not restraining the generality of the enacting clause will be attended with an inconvenience or particular mischief, it shall be restrained by the preamble, otherwise not, Ryall v. Rowles, 1 Vez. 365. No inconvenience or mischief can arise by declaring this transaction unlawful. It is said that the lots of many towns in the state have been disposed of in this manner, and that the security of many titles would be disturbed if the legality of the original transaction should be called in question. But how a contract, executed by a conveyance, and not fraudulent as to third persons, could be impeached on this ground, I am at a loss to discover.
The construction of English statutes before our revolution, and in pari materia with our acts of assembly, although not conclusive, is yet entitled to great weight in doubtful cases under the latter. The 10 and 11 Wm. III. c. 17, is substantially the same as our act of 1729, the preamble of which is narrower than that of the act of 1762, now in force. The 8 Geo. I. c. 2. Sec. 36, was not founded on a supposition that sales of houses or lands by way of lottery were not within the purview of the 10 and 11. Wm. III. The preamble to that section declares that former prohibitions had been evaded, and the enacting clause increases the penalty, two-thirds of which is given to the-informer to encourage prosecutions for this offence. The inference attempted by the counsel therefore fails. The preamble of the 10 and 11 Wm. III. states the grievance to be, that children and servants were defrauded; yet the purview, according to legislative interpretation, was not narrowed to exclude lotteries of the same character of that under consideration.
*167 To prove the cotemporaneous exposition of this act, the lottery for the sale of lands proposed by the proprietary in 1735, whilst the act of 1729 was in force, and the drawing for preference of location under the application system in 1769, are mentioned. The last was any thing but a lottery. The proprietary received nothing for tickets: the seven shillings paid on each, went to the officers of the land office to defray the expenses; and no interest vested on the drawing, but only on the issuing of the location, which the proprietary might have withheld if he had thought proper. It was to ascertain whose pretensions should yield, where there was more than one application to become the purchaser of a particular spot, that the decision by lot was had recourse to, and nothing else was decided by it. The scheme of 1735 was, however, strictly a lottery. But the proprietary was in that capacity a quasi sovereign, being the executive of the colonial government, and it is not very clear that an act of assembly would extend to him unless he were particularly named. Would the statute of limitations, (had it then existed,) have run against him ? He had a right under the charter, to dispose of his land, which the legislature could not take away, and whether they could modify it is a matter not free from doubt;.at all events these considerations might readily induce him to suppose, and the people to acquiesce in it, that he was, for personal reasons, exempted from the provisions of the act of 1729.
I am also of opinion that the 27th section of the aqt of the 2d of April, 1811, to incorporate the Union Canal Company, comprehends this case. It prohibits the sale of all tickets in lotteries not authorised by law. The object of the legislature was to direct the spirit of speculation that existed toward the lottery which that company was authorised to make, to ■ aid in the undertaking in which they were engaged, and to suppress every other lottery. This view would be defeated if projects of this sort, so flattering to the cupidity of adventurers, were permitted to be brought in competition by individuals. I therefore concur in opinion that the judgment be reversed.
Duncan J.
An adjourned sessipn of this Court was held, in October last, principally for the purpose of deciding the general question respecting a species of lotteries, called land *168 lotteries. It was represented as a question of importance ta many of the inhabitants of Lancaster county ; as property to a vast amount in that county had been disposed of in this way; and that all was stagnant until the ultimate decision in this Court. The case selected was one of the’ most favourable cast for the defendants in error, as the plaintiffs had drawn a valuable prize, accepted a conveyance, and now hold the title. A general view has been taken of all the acts on the subject of lotteries, and of' the practice and usage since the passage of the acts of 1729 and 1762, in order to shew that the disposition of lands by lottery was not within the meaning of these acts.
Whatever may have been the extent of the provisions of former laws, the act of 17th September, 1762, 1 Sm. L. 246, embraces in terms all lotteries whatsoever. The mischief of lotteries, as stated in the preamble, has produced in a great degree the distress which now affects this county ; they have produced the impoverishment of many poor families, and have reduced to want the families of many of the wealthy ; and the corruption not only of the youth but of the aged ; for the rich and the poor, the young and the advanced in life, have plunged into the vortex, with a delusion only exceeded by the South Sea and Mississippi schemes. No observing man but must pronounce, that they have' produced the very evils foreseen by the legislature of 1762 ; that they have been promoters of vice, idleness, and immorality, and have been injurious to trade, commerce and industry ; to meet and to prevent the evils foreseen by the legislature, and for remedy thereof, it was enacted, adjudged, and declared, that all lotteries whatsoever, whether of' a public or private nature, are common and public nuisances, and against the common good and welfare of the people. The second section of the act prohibited, under the heavy penalty of 500 pounds, the setting up, erecting, making, exercising, keeping open, shewing or exposing to be played at, drawn, or thrown at, any lottery, play, or device, or causing, or procuring the same to be done, either by dice, lots, cards, balls, tickets, or any other numbers or figures, or in any other manner or way whatsoever. The third section imposes a penalty of 20 pounds on the person who shall sell, advertise, or expose to sale, any ticket or device whatsoever in. such lotteries, plays, or devices. The act of 20th January, 1792, 3 Sm. L. 60, recites *169 the act of 1762, and declares a doubt, whether it extended to lotteries out of the state ; it then prohibits, under the penalty of five pounds, the exposing or offering to sale, barter, or exchange, any ticket or chance, or other evidence of ticket or chance, in any lottery or other device, in the nature of a lottery, by whatsoever name it may be called, not authorised by dle laws of this Commonwealth..
By the act of 2d April, 1811, the disposition or offer to dispose of any lottery ticket not authorised by the Commonwealth, subjects the offender to a penalty not exceeding 2000 dollars, for the use of the Union Canal Company. The clause respecting lotteries in the act for regulating pedlars and vendors is repeated by the act of 1762. If that act was confined to wares sold by pedlars, and goods sold at vendues, the act of 1762, was intended to be more comprehensive in its nature, and it is so in its terms, to meet the increasing evil in whatever shape or ,form it might assume; whatever might be the device or its name, all lotteries whatsoever, either public or private, are declared to be nuisances, and against the common good ; the pernicious consequences are stated in the preamble ; as a remedy, all of whatsoever description, quality, device, or name, all are enacted, adjudged, and declared to be nuisances.
Our language must be strangely defective ; it must be void of all precision and certainty, if human ing .nuity could raise a doubt. A lottery is a game at hazard. By the act of 22d Aprils 1794, all games at hazard for money or other valuable things are prohibited. A lottery is a distribution of prizes by chance. Let us test the scheme of Joseph Charles by this definition. 200 lots were the prizes. The adventurer on receiving a certificate entitling him to such lot as might be drawn against his number, was to give his note for 350 dollars. Without speaking of the inequalities in value that might arise from local situation, there were two capital prizes; lot No. 24, entitled to an elegant new two story dwelling house, and is represented as of the value of 11,000 dollars ; No. 28, to a large new barn and stabling, estimated at 3000 dollars. Now the man who paid 330 dollars may for this, draw by numbers either 11,000 or 3000 dollars; this chance depending on a drawing by numbers. All the lots were not estimated at 330 dollars ; or the lottery owner must lose, for it gives up to the lucky adventurers two lots esti *170 mated at 14,000 dollars. But it is said, that however comprehensive the words may be, yet taking into view all the acts made on this subject, as distribution of land by lottery was unknown, at least seldom occurred, this could not be in the contemplation of the legislature. The cotemporaneous practice and usage under the law, furnished an evidence of this ; for that two public lotteries had been had by the proprietaries for the disposition of their lands, and to support this two instances of lotteries of the proprietaries are stated; The first in 1735, was a lottery, but there was no law forbidding it. The act of .1729, for regulating pedlars and vendors, is admitted on all hands not to embrace a disposition of lands by lottery. The latter, whatever name may be and was given to it, was not a lottery, either in the letter, the spirit, or the intention of the framers of the act of 1762.
The proprietaries, in February, 1769, issued the advertise* ment notifying the people, that the land office would be opened at 10 o’clock in the morning of the 3d April,.1769, to re* ceive applications from all persons inclinable to take up lands in the new purchase. Numbers assembled on that morning* Many had taken possession of the avenues to the land office the preceding evening. All were ready to rush in at the instant with their applications ; very many desirous to apply for the same tracts. If it was first received this would establish the priority. All was riot and confusion-; and apprehensions were entertained, that in the struggle, blood might be shed, and lives lost. The governor and proprietary agents adopted this expedient,, to ascertain priority, and they gave the reasons for it; the 3d April, 1769, being appointed for the opening of the land office for the new purchase, and it being known that great numbers of people would attend, ready to give in their location at the same instant, it was the opinion of the governor, &c. that the most- unexceptionable method of receiving the locations, would be to put them all together, (after being received from the people,) into a box or trunk, and after mixing them well together to draw them out and number them in the order they should be drawn, in order to determine the preference. See 2 Sm. L. 169. There was no sale or distribution of tickets; no money received for the land; and none was to be received, unless the applicant had owned the land he applied for. It was a distribution of favours, not a disposition of lands. No man could be de *171 frauded, or family impoverished, by this. It is not within the mischief intended to be prevented. It is not within the letter. It was not a mischievous or unlawful game, but a dispensation of favour and preference, without gain to the owner or loss to the applicant.
It has been again compared to allotment in partition by coparceners, joint-tenants or tenants in common. I cannot discern the smallest resemblance ; there the parties have an unlimited interest in the lands ; the allotments are equal; the drawing only gives a right of election to an equal allotment, there must be an allotment to each one of his purpart; some one must have the first right of choice; but the adventurers have neither held jointly, nor severally, undivided parts of the 200 lots. The interest arose when the number was drawn, and then it was a specific interest in the lot so numbered.
It is a. miserable subterfuge, to say that this is not a lottery, because there are no blanks ; for every holder of a certificate obtained a lot. The law would be a dead letter, if this device were to prevail. A lottery of money or other personals, precious wares ; a gold watch and a pair of brass sleeve buttons, a silver thimble and a diamond necklace, the highest prize in money, 10,000 dollars; the lowest a groat; the very device is prohibited. Dob. Ency. tit. Lott. In 1748 Dr. Rawlinson proposed to the Society of Antiquaries a scheme of a very rich lottery ©f 400,000 shares without any blanks. The case before us, and the multiplicity of cases depending on this decision, shew it to be within the mischief, and it falls within the very letter of the law. To adopt the words of the act of 1792, the certificate was a ticket or chance, or evidence of a chance, in a lottery, or a device by way of lottery, by whatever name it may be called. All chances by way of lottery are illegal, and adjudged, enacted and declared to be nuisances, unless authorised by some act of assembly. The grand object of ail lotteries in countries where they are authorised is, to raise money for the state, under the direction of government. See Dob. Ency. tit. Lott, for their history in England. By the stat. 10 W. & M. all lotteries are declared to be public nuisances ; and all licenses, grants, and patents for the same are contrary to law. 4 Bl. Com. Nothing but an act of parliament in England, nothing but an act of assembly in Pennsylvania, can authorise them. All not authorised are *172 prohibited as against the public good. There is no distinction in reason or in the law between the disposition of personal property and of real, by chances ; the evil is as great in the one case as in the other; the mischief appears to all our experience to be more extensive from land lotteries. If the law has slept, it is not dead ; the great evils in our day from the most pernicious of all kinds of gaming; most pernicious because most extensive, have brought it into action ; the disuse of it has not repealed it; our statute book is filled with act on act, 1762, 1792, 1811, prohibiting all lotteries under most severe penalties, and the justice of the country calls aloud for their execution. One argument yet remains to be disposed of. If I understand it, it is this: the policy of the laws went only to prohibit a species of lotteries that were frequent, and as land lotteries had rarely occurred, the legislature did not intend to provide against them. It is the duty of legislatures to foresee, and to meet and prevent all acts that tend to the destruction of industry; that may produce vice and immorality; they are not to wait until the evil has actually happened. Admit for the sake of argument, that lotteries of pedlars’ wares, and other personal effects and money, had attracted the attention of the legislature, was it not provident and wise not only to prohibit the lesser evils which had happened, but to prevent the greater evils that might arise from any and every lottery of whatever nature, name, quality, or description. They have so done ; and is it for Courts to say, they did not intend it; for though it may be admitted, that statutes are not to be extended by equity to cases which rarely happen, yet when the words of a statute do sufficiently extend to an inconvenience seldom happening, they are construed to extend to it as well as if it happened more frequently ; and it is no reason why it should not, because it happens but seldom. 6 Bac. (Wils. ed.) 388. Had the preamble to the acts cited only particular inconveniences it would not exclude any others for which a remedy is given by the enacting part. Rex v. Athos, 8 Mod. 144. Enacting words, if they take in the mischief, shall be extended to that purpose, though the preamble to the act does not warrant it. Basset v. Basset, 3 Até. 20S. It therefore appears most clearly to me, that this was a lottery not authorised by any law of the Commonwealth, but expressly prohibited by several laws. If so, it must follow, that *173 the plaintiff below who seeks a remedy in a court of law on a contract forbidden by law, and declared to be a common nuisanee, cannot recover. To support this it is unnecessary to load the case with a reference to'particular authorities. I shall lay down the general principle, as applicable. All contracts which have for their object any thing which is repugnant to justice, or against the general policy of the common law, or the provisions of a statute, are void; and where a contract or agreement is entered into with .» view to violate any of their general principles, there is no form of words, however artfully introduced or omitted, which can prevent courts of common law or equity from investigating the truth of the transaction. The principle which courts of justice must go upon is to enforce the performance of contracts not injurious to society ; and it would be absurd to say, that a court of justice shall be bound to enforce contracts contrary to and against the public good ; for no man shall come into a court of justice and say, give me a sum of money which I desire to have contrary to law. A party to an unlawful contract cannot recover through the medium of that.contract. Nor can it make any difference whether the statute declares the contract to be void, omits so to do, or prohibits under a - penalty; penalty is prohibition; but here are both penalty and prohibition.
Such is the construction on this very lottery question, 6 Binn. 321, that in case of a lottery authorised by law, where the ticket had been sold subsequent to the time allowed by the act, it conferred no right to receive the prize. The objection sounds very ill indeed in the mouths of the plaintiffs in error ; but it is not for their sake that the objection is allowed ; it is founded on general principles of policy, which they shall have the advantage of contrary to the real justice between the parties. The principle of public policy is, that no Court will lend its aid to a man who grounds his action upon an immoral or illegal act. Mitchell v. Smith, 1 Binn. 110. Justice, as between these individuals, would require either payment of the money or reconveyance of the property; but principles of public convenience demand that the justice of the case shall yield to higher considerations, the operation of the precedent on public morals, and the public interest. It is fqr these reasons courts of justice will not assist an illegal transaction in any respect.
Judgment reversed.